IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>BNSF RAILWAY COMPANY,<br><br>Defendant. | **8:21-CV-369**<br><br><br>**MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |

The Equal Employment Opportunity Commission (EEOC) has sued the BNSF Railway Company (BNSF), alleging that BNSF subjected female train conductor Rena Merker "and other aggrieved individuals" to a sexually hostile working environment in violation of Title VII, 42 U.S.C. §2000e *et seq*. Filing 10. BNSF moved to dismiss for failure to state claims on which relief can be granted. Filing 11. While BNSF's Motion to Dismiss was pending, BNSF terminated Merker, allegedly for attendance issues.

This matter is now before the Court on the EEOC's April 14, 2022, Motion for Temporary Restraining Order (TRO), Filing 24,[1] in which the EEOC asks the Court to restore the *status quo ante* by immediately returning Merker to work and prohibiting BNSF from engaging in any retaliatory action against employees who cooperate with or provide information to the EEOC in support of this lawsuit. BNSF filed a response to the EEOC's request for a TRO on April 19, 2022.

---

[1] In the same filing, the EEOC also seeks a preliminary injunction and an expedited hearing.

Also on April 19, 2022, the Court held a hearing on the EEOC's request for a TRO at which counsel for both the EEOC and BNSF appeared. At the end of the TRO hearing, the EEOC requested and was given until April 26, 2022, to provide additional materials to the Court in support of its request for a TRO. BNSF was likewise given the opportunity to supplement its filings by the same deadline, but the Court limited BNSF's supplemental response to matters brought up during the TRO hearing.

Having reviewed the parties' written and oral submissions, including their supplemental filings, the Court concludes that the EEOC's Motion for Temporary Restraining Order should be denied. Nevertheless, the Court will set a further hearing on the EEOC's Motion for a Preliminary Injunction after the parties conduct limited discovery.

## I.   INTRODUCTION

### A.   Procedural Background

#### 1.   *Administrative Proceedings*

The relevant procedural background began on January 18, 2018, when Rena Merker, a train conductor who operates locomotives with an engineer in two-person crews in BNSF's Alliance railyard, filed a charge of discrimination with the EEOC. Filing 10-1. Merker alleged on behalf of herself and other aggrieved individuals in non-management positions that they had been subjected to a pattern and practice of gender discrimination, sexual harassment, and sex discrimination, as well as retaliation for opposing gender discrimination, sexual harassment, and sex discrimination. Filing 10-1 at 1–4. On November 24, 2020, the EEOC issued a letter of determination to BNSF stating that the EEOC had reasonable cause to believe that BNSF violated Title VII because Merker and other female employees at BNSF's Alliance location were subjected to harassment and that Merker was disciplined in retaliation for complaining of the sexual harassment. Filing 10-

2 at 1. The EEOC was unable to reach a conciliation agreement with BNSF and issued a notice of conciliation failure to BNSF on April 8, 2021. Filing 10 at 3.

### 2. The EEOC's Lawsuit

On September 23, 2021, the EEOC sued BNSF under Title VII on behalf of Merker "and other aggrieved individuals" adversely affected by similar conduct asserting a claim of a sexually hostile work environment. Filing 1 at 1, 8. The EEOC filed an Amended Complaint on December 20, 2021. Filing 10. More specifically, the Amended Complaint alleges that Rena Merker has been harassed by coworkers' sexual and demeaning comments and other conduct. Filing 10 at 4. The EEOC further alleges that Merker and other female employees have experienced similar demeaning and sexually explicit comments and conduct "almost daily" from 2011 to the present. Filing 10 at 5. The EEOC accuses BNSF's supervisors and human resources representatives of turning a blind eye to the harassing conduct. Filing 10 at 6. Neither the original Complaint nor the Amended Complaint asserts claims of retaliation on behalf of either Merker or other aggrieved individuals. BNSF filed a Motion to Dismiss the EEOC's Amended Complaint on January 3, 2022. Filing 11.

On April 15, 2022, the Court issued a Memorandum and Order, Filing 28, granting in part and denying in part BNSF's Motion to Dismiss. Specifically, the Court found that the EEOC has stated a plausible sexually hostile environment claim on Merker's behalf, but that the EEOC has failed to state a claim on behalf of the other female employees. The Court granted the EEOC leave to amend its Complaint. Filing 28 at 24.

### 3. The TRO Proceedings

As mentioned above, while BNSF's Motion to Dismiss was pending, BNSF terminated Merker, allegedly for attendance issues. On April 14, 2022, the day before the Court entered its Memorandum and Order on BNSF's Motion to Dismiss, the EEOC filed the Motion for Temporary

3

Restraining Order now before the court. Filing 24. BNSF filed a response to the EEOC's request for a TRO on April 19, 2022, shortly before the TRO hearing. At the end of the hearing, the EEOC requested, and the Court granted, seven days to file additional materials in reply to BNSF's response. The Court also gave BNSF seven days to file a supplemental response but limited BNSF's supplemental response to matters brought up during the TRO hearing. On April 22, 2022, the EEOC provided for the Court's *in camera* review unredacted copies of two anonymous declarations it had previously submitted. Filing 25-3; Filing 25-4. BNSF filed its supplemental brief, Filing 33, and supplemental index, Filing 34, shortly before the close of regular business on April 26, 2022. The EEOC filed is supplemental brief, Filing 35, with an additional declaration attached, Filing 35-1, just after midnight on the morning of April 27, 2022. It was then granted leave to file corrected versions of its supplemental brief, Filing 38, and supplemental index, Filing 39, on April 28, 2022.[2]

With these submissions in hand, the court turns to the factual background to the EEOC's request for a TRO.

## B. Factual Background

### 1. BNSF's Progressive Discipline

The Court finds that a critical part of the factual background to the EEOC's request for a TRO is BNSF's disciplinary policy for attendance violations. Conductors like Merker are subject to BNSF's Train, Yard, & Engine service (TYE) Attendance Guidelines. Filing 30-12 at 3. Those Attendance Guidelines establish an employee's permissible days off for rolling 3-month periods (for example, September through November, then October through December, etc.). Filing 30-12

---

[2] The EEOC's supplemental materials were technically late, but only by ten minutes. In the early afternoon on April 27, 2022, the EEOC notified the Court that it had filed the incorrect version of its supplemental brief, owing to computer problems, and that it would file a new version as soon as its motion to strike the incorrect version was granted. In its discretion, and in the interest of fairness, the Court will excuse the technical untimeliness of the filing and will consider it.

at 4. Medical leave is not counted against the employee under the Attendance Guidelines. Filing 30-12 at 4. Merker's union representative declared that BNSF's Attendance Guidelines are extremely complicated, so that it was nearly impossible to know whether an employee would run afoul of their requirements. Indeed, the representative stated that he needed to locate and review eight to ten documents and read some 71 pages to understand the attendance policy fully. Filing 25-2 at 1–2. He declared, further, that many provisions of BNSF's Attendance Guidelines are vague and open to interpretation. Filing 25-2 at 2–3. On the other hand, Merker testified at her last investigation hearing that she personally kept track of the days she "laid off," that is, chose not to work. Filing 30-2 at 45.

Merker's union representative also asserted that several elements of the Attendance Guidelines allow BNSF officials to apply the policy subjectively using their own discretion. Filing 25-2 at 2–3. BNSF argues that excerpts of the collective bargaining agreement (CBA) submitted by BNSF, Filing 30-15, suggest that BNSF officials have very little discretion in whether or not to impose discipline. The Court finds that the cited excerpts of the CBA demonstrate that a formal hearing *may or may not* result in discipline being assessed, if a violation is found, but they do not set out any criteria limiting discretion to decide that issue. Filing 30-15 at 5 (SECTION D. Hearing Decision). Indeed, a BNSF official declared that "management may grant leniency when an employee stands for dismissal." Filing 30-1 at 6. Nevertheless, discipline for attendance violations and the procedures before discipline can be imposed are highly structured, as explained below.

BNSF also may issue employees "low performance" notices. Merker declares that "low performance" means that the employee's number of work hours was in the bottom 10% of her work group for the period in question. Filing 25-1 at 1. BNSF's evidence, however, defines "low performance" as a "process [of review] when an employee is not working comparable to their

5

peers." Filing 30-12 at 7; Filing 30-13 at 1. According to BNSF, employees who fall "significantly below" their peers in performance of full-time service are identified as "low performance." Filing 30-13 at 1. In its supplemental brief, Filing 38 at 11, the EEOC argues that BNSF management apparently has unfettered discretion to issue "low performance" discipline to any employee, citing BNSF's response brief, Filing 29 at 7. A party's argument, of course, is not evidence, and the cited portion of BNSF's response brief falls well short of an admission that its managers have unfettered discretion concerning "low performance" discipline. What BNSF asserts in the statement on which the EEOC relies is as follows:

> The employees who fall significantly below their peers in the performance of full-time service—not simply "the bottom 10%"— are identified. The names of these employees are provided to leadership of the respective division to review and determine if coaching and counseling (non-disciplinary alternatives) and/or discipline is warranted.

Filing 29 at 7 (citations omitted). This statement, in turn, relies on—indeed, quotes from—a declaration by Pam Sherlock, the Director of Field and Employee Services in BNSF's Labor Relations department. Filing 30-13 at 1-2. Ms. Sherlock declares that for a first instance of "low performance," an employee may not be given any discipline:

> A common approach is an employee is first given a coaching and counseling for low performance instead of being disciplined. BNSF policy does not require issuance of a coaching and counseling but allows an employee to instead be disciplined initially. As a result, when a later violation occurs, even many years later, it is common to address the issue as one of failing to follow the instructions provided in an earlier, even a much earlier, coaching and counseling.

Filing 30-13 at 3. This evidence illustrates that there is a one-time choice between "coaching and counseling" and "discipline" for "low performance," in a manager's discretion, but not "unfettered discretion" about whether to impose discipline for any subsequent instances of "low performance." The option for initial leniency, even in a manager's discretion, before subjecting an employee to

6

potential first level discipline in a progressive discipline system simply is not enough to suggest that a discretionary disciplinary system is used as a pretext for retaliation.

In its supplemental brief, the EEOC argues that a manager can choose between "no discipline" and a notice of investigation for an attendance violation. Filing 38 at 13. The EEOC also argues that Merker's manager, Jeff Stevens, the Terminal Superintendent for Alliance, chose a notice of investigation in Merker's case. Filing 38 at 13. Mr. Stevens declares that he and his trainmasters review the rolling attendance lists for Alliance railyard employees and "decide to either (1) request a 'no discipline' notice from the General Manager and Director of Administration; or (2) to notice the employee for an investigation to determine if they were in violation of the Attendance Guidelines," but that "[d]oing nothing is not an option." Filing 34-1. He declares that his discretion is limited by BNSF policies and because he must "explain in writing to the General Manager and Director of Administration for the Powder River Division the circumstances why I and/or my leadership believe the employee should not be held accountable for exceeding their threshold days." Filing 34-1 at 3–4. He adds, "[S]ometimes my requests are denied." Filing 34-1 at 4. The Court finds that this level of discretion, checked by an independent reviewer, is not enough to suggest that the disciplinary system is used as a pretext for retaliation.

BNSF's policies provide for progressive discipline for violations of Attendance Guidelines and "low performance": first formal reprimand, followed by a 10-day record suspension, then a 20-day record suspension, and then dismissal. *See* Filing 30-1 at 6; Filing 30-12 at 5-6. A "record suspension" is noted on an employee's disciplinary record but does not result in actual time away from work or lost pay. Filing 30-12 at 4. It appears that the primary consequence of a record suspension, at least for present purposes, is that it moves the employee up the progressive levels of discipline, which may ultimately result in dismissal. However, as mentioned above, non-

disciplinary "coaching and counseling" may be issued, instead of discipline, for a first instance of "low performance." The progression of discipline levels starts over if the "review period" for a disciplinary action expires. The "review period" is a specified period of working time, not including furloughs or sick leave, after a violation. Filing 30-12 at 5. In the case of each of Merker's disciplinary actions, that "review period" is shown in her Discipline Record to be twelve months. *See* Filing 30-7 at 2.

When an employee is reported for an attendance violation, she is given a notice of an investigation hearing. The CBA requires BNSF to provide employees with a fair and impartial investigation hearing and to allow union representation at the hearing the opportunity to call and question witnesses, to offer evidence, and to give a closing statement. Filing 30-12 at 1. The EEOC argues in its supplemental brief that the disciplinary investigations are far from impartial but points only to one of Merker's disciplinary investigations to support this contention. Filing 38 at 12. The Court will consider that incident in some detail, below. As a matter of practice, a "waiver," or agreement not to challenge BNSF's investigation of an alleged violation and to accept the discipline, is included with the notice of investigation. Filing 30-12 at 4.

Consistent with BNSF policy, if an employee "stood for dismissal" as the next level of progressive discipline, the hearing officer's decision is referred to the Labor Relations "PEPA team." Filing 30-1 at 6. "PEPA" apparently stands for BNSF's Policy on Employee Performance Accountability. Filing 30-11. The "PEPA team" is a group of BNSF Labor Relations employees "charged with, among other things, reviewing potential dismissal decisions for compliance with the applicable collective bargaining agreement and consistency [with] [t]he goal . . . to maintain consistency in dismissal decisions across the BNSF system." Filing 30-12 at 2. If the PEPA team confirms the discipline selected by the hearing officer, that discipline is imposed. The Court finds

that the PEPA review process is reasonably designed to provide for compliance with the CBA and consistency in application of the attendance policies, thus providing a substantial limit on the discretion of the hearing officer in the imposition of discipline.  Filing 30-12 at 2. The EEOC has offered no evidence suggesting otherwise.

If the investigation hearing results in discipline, the employee's union can appeal the adverse decision on behalf of the employee both within BNSF and then to a Public Law Board (PLB), which is a group of arbitrators. The PLB can overturn discipline and dismissal decisions and both BNSF and PLB processes can result in reinstatement of a dismissed employee. Filing 30-12 at 2. These procedures place further limits on the discretion of BNSF officials in meting out discipline. Again, the EEOC points to no evidence to the contrary.

An employee's Discipline Record is shown in his or her Employee Transcript.[3] Employees have access to their Employee Transcripts, so they would have the ability to review what discipline they have received and when. Filing 30-1 at 4. The Court finds that, from review of Merker's Discipline Record, an employee would also be able to determine what their potential discipline for their next violation would be and when any existing review period would expire, subject to furloughs or sick leave, restarting the progression of discipline levels. *See, e.g.,* Filing 30-7 at 1-2.

2. *Merker's Discipline Record*

The Court finds that the next series of critical facts concern Merker's Discipline Record. Three instances of discipline in late 2021 and early 2022 are at issue in the EEOC's request for a TRO, although the Court finds that earlier instances of discipline are also relevant.

---

[3] The parties sometimes refer to such an Employee Transcript as the employee's "hard card." *See, e.g.,* Filing 30-1 at 4.

a.   The First Incident in 2021 Resulted in Lenient Treatment

Merker declares that, on October 18, 2021, about a month after the EEOC filed this lawsuit, BNSF notified her of an investigation into her allegedly "low performance." Filing 25-1 at 1. Merker states that this is the first time she recalls being brought up for discipline since August 2017. Filing 25-1 at 1. Merker's Discipline Record, Filing 30-7, however, shows that, on May 21, 2019, Merker received a formal reprimand for excessive absences for the 3-month period ending April 2019; on October 18, 2019, she received a 10-day record suspension for excessive absences for the 3-month period ending July 2019; and on December 19, 2019, she received a 20-day record suspension for excessive absences for the 3-month period ending November 19, 2019. Filing 30-7 at 2. Her Discipline Record indicates that, in each of these three instances, Merker signed a waiver accepting the discipline, which obviated the need for an investigation hearing. Filing 30-7 at 2. Thus, it should have been apparent to Merker that her next attendance violation could lead to dismissal.

At an investigation hearing on November 3, 2021, concerning the September "low performance" notice, Merker told BNSF that she believed that BNSF was taking action against her because of the EEOC's lawsuit. Filing 25-1 at 1, 6–7. Despite her contention, on November 12, 2021, BNSF issued Merker a Level S 30 Day Record Suspension and a 3-year probation period because of this instance of "low performance." Filing 25-1 at 8. According to Merker, "Level S" is the highest level of discipline short of termination. Filing 25-1 at 1. The Court finds that the Level S 30-day record suspension issued on November 12, 2021, was something of a departure from the ordinary progression of discipline under the BNSF policy, however. Merker's previous three disciplinary actions had been a formal reprimand, followed by a 10-day record suspension, followed by a 20-day record suspension, which meant that the next violation could result in termination, rather than the more lenient 30-day record suspension imposed on Merker. *See* Filing

30-1 at 6; Filing 30-12 at 5-6. Indeed, a letter dated November 12, 2021, sent to Merker to notify her of the discipline imposed, states in part, "Be advised this infraction could have resulted in dismissal, and this Level S 30 Day Record Suspension is being granted solely as a matter of managerial leniency. Any future infractions could result in dismissal." Filing 25-1 at 8. The Court agrees that a 30-day record suspension for this violation was "a matter of managerial leniency" in this case, because it departed from the usual progression of discipline by not resulting in termination.

The EEOC and Merker argue that, in imposing this discipline, BNSF improperly relied on a prior disciplinary action from 2012. Filing 25-1 at 1. The Investigation Data Worksheet for the November 3, 2021, investigation hearing, Filing 25-1 at 5, identifies the date of the pertinent incident as "10/13/2021," but it then refers to Merker's "failure to comply with instructions relating to your low performance and availability given to you by Larry Snyder on October 18, 2012, and in [a] certified letter dated October 19, 2012." The November 12, 2021, letter notifying Merker of the discipline imposed as a result of the November 3, 2021, investigation hearing, Filing 25-1 at 8, identifies the date of the investigation hearing and refers to failure to comply with instructions given on October 18 and 19, 2012, but it does not identify the date of the incident in which Merker failed to comply with those instructions.

The record does not include the certified letter including Mr. Snyder's instructions sent to Merker on October 19, 2012. Merker's Discipline Record, Filing 30-7, however, does refer to instructions and a letter issued by Mr. Snyder on October 19, 2012, in relation to a violation (for which Merker received a "formal reprimand") on August 21, 2017. Filing 30-7 at 1. Similarly, Pam Sherlock, declares that Merker "first received coaching and counseling for low performance

from Larry Snyder in 2012—in her second year of employment." Filing 30-13 at 2. Ms. Sherlock

then declares,

> [Merker] received a level S record suspension [on August 21, 2017,]
> for failure to comply with those instructions from Larry Snyder [on
> July 19, 2017], however it was reduced by a Public Law Board
> appeal to a Formal Reprimand in 2017. She again received a level S
> record suspension for failure to follow instructions related to low
> performance in 2021. Even though she stood for dismissal at that
> time, meaning that she could have been dismissed under BNSF's
> policies, she was granted leniency and only given a level S record
> suspension. . . . Here, Ms. Merker has been given even more than
> the usual leeway to meet the expected standards.

Filing 30-13 at 2–3 (bracketed dates are as shown in Filing 30-7 at 1). Merker's Discipline Record

likewise shows a reduction of the discipline issued on August 21, 2017, from level S to a "formal

reprimand" at the behest of the Public Law Board (PLB), as well as the Level S record suspension

imposed in 2021. Filing 30-7 at 1–2.

The Court concludes that Merker's Discipline Record, Filing 30-7, shows that the

discipline imposed on November 12, 2021, was not imposed for misconduct in 2012. The

Investigation Data Worksheet likewise supports this conclusion because it refers to a violation on

October 13, 2021, and a November 3, 2021, investigation hearing. Filing 25-1 at 5. In short, Merker

was not disciplined in 2021 for conduct in 2012, although she was disciplined in November 2021

for her failure in October 2021 to comply with counseling that she had received in 2012.

> b. The Second Incident in 2021 Resulted in No Discipline Because
> BNSF Found No Violation

On January 8, 2022, BNSF notified Merker of an investigation into her alleged violations

of BNSF's Attendance Guidelines in October, November, and December 2021. Filing 25-1 at 1.

On January 24, 2022, Merker signed a "waiver" that she would not challenge BNSF's investigation

of these alleged violations in exchange for a 10-day suspension. Merker understood that this

agreement meant that she had been disciplined for "laying off" (taking a day off) in October,

12

November, and December 2021. Filing 25-1 at 2. The record shows, however, that Merker's

"waiver" was never effective, because BNSF determined that she had not committed any violation.

Stephanie Detlefsen, a Director in Labor Relations for BNSF, declared as follows:

> Once Ms. Merker's lay off sick dates were updated to show as
> medical leave, Ms. Merker was not in violation of the Attendance
> Guidelines for the rolling period of October through December 2021
> because medical leave is not counted against the employee under the
> Attendance Guidelines. Accordingly, even though a waiver had
> been included with her notice of investigation (as is the practice), it
> was ineffective and was never documented on her personnel record.
> *See* Exhibit 7. In other words, BNSF never accepted the wavier and
> she never received the discipline set out in the waiver because she
> in fact had not violated the Attendance Guidelines.

Filing 30-12 at 4. BNSF sent Merker a letter captioned "Investigation Cancellation" on January

23, 2022, which informed Merker that the investigation at issue in the January 8, 2022, notice "has

been cancelled in its entirety." Filing 30-8 at 1. The Court finds that no discipline was imposed

pursuant to the January 8, 2021, notification of a supposed attendance violation in October,

November, and December 2021 and that Merker's Discipline Record, to which she had access,

reflected that fact. Filing 30-7 at 2 (showing no discipline for an attendance violation for the 3-

month period ending in December 2021).

Furthermore, the offer of a 10-day record suspension was a mistake, because Merker's

previous level of discipline, from November 12, 2021, was a 30-day record suspension, and the

one before that, from December 19, 2019, was a 20-day record suspension. Filing 30-7 at 2; Filing

30-13 at 5. The review periods for the first of those violations had not yet expired, because of

Merker's medical leave. Filing 30-7 at 2; Filing 30-13 at 5.

### c.   The Third Incident Resulted in Termination

On February 11, 2022, BNSF notified Merker of another investigation into her alleged

violation of Attendance Guidelines for the months of November and December 2021 and January

2022, and BNSF held an investigation hearing into that alleged violation on March 18, 2022. Filing 25-1 at 2. At the investigation hearing on March 18, 2022, Merker, through her union representative, told BNSF officials that she believed this investigation was in retaliation for the EEOC's lawsuit. Filing 25-1 at 13. Merker declares that she "understood" that her attendance in January had been within the Attendance Guidelines after the discipline she claimed she had already received under her "waiver" in response to the January 8, 2022, notice. Filing 25-1 at 2. According to Merker, BNSF explained during the investigation hearing that it had cancelled Merker's 10-day suspension, which Merker declares meant that BNSF could "re-discipline" her for the months of November and December 2021. Filing 25-1 at 2. The union official who represented Merker at the investigation hearing in March 2022, declared that BNSF's cancellation of Merker's 10-day suspension for the November and December 2021 violations, then notification to her of a violation for the 3-month period ending in January 2022, "effectively put [Merker] in 'double jeopardy,' punishing her twice for the same months," and that he was "not aware of BNSF ever bringing this type of 'double jeopardy' or double discipline against an employee for the same alleged attendance violation." Filing 25-2 at 4.

The transcript for the March 18, 2022, investigation hearing shows that BNSF's representative testified that the 10-day waiver was cancelled and was not in Merker's public record. Filing 30-2 at 9. The investigation hearing officer also addressed this issue in his declaration. Filing 30-1. He declared that, after the investigation hearing, he reviewed Merker's personnel record and also concluded, as had Ms. Detlefsen, that the waiver was cancelled because updated sick dates showed there was no violation. Filing 30-1 at 3–4. The Court concludes that the record does not demonstrate that Merker was subjected to any "double jeopardy" or "double discipline" when she was disciplined in March 2022 for an attendance violation for the 3-month

period ending in January 2022 and that her Discipline Record, Filing 30-7 at 2, shows that no discipline had been previously imposed for that period.[4]

The EEOC contends in its supplemental brief that the cancellation of the 10-day discipline agreement is "suspicious," because Merker's attendance would have been in compliance with Attendance Guidelines but for the cancellation which she did not know about. Filing 38 at 11 (citing the investigation hearing transcript, Filing 30-2 at 60). At the investigation hearing, Merker's union representative argued that the cancellation was a "set up," because Merker had used her "layoffs" in January and had signed a waiver for violations in the two prior months, which "create[d] a scenario in which she would have no way of not violating the Attendance Policy." Filing 30-2 at 60–61. The EEOC has not pointed to any evidence that discipline for a prior 3-month rolling period somehow means that absences in the two months that carry over to the next 3-month rolling period do not "count" in the latter period. Thus, this evidence does not suggest that the cancellation of the prior notice of investigation and waiver was used to impose retaliatory discipline.

From evidence at the March 18, 2022, investigation hearing, the hearing officer determined that, during the relevant period, Merker had a "layoff threshold" of 7.5 weekdays and 3 weekend days under the Attendance Guidelines. Filing 30-1 at 2. The EEOC contends that this "layoff threshold" is not properly explained or documented in any evidence. Filing 38 at 12. However, Ms. Detlefsen declared, "Merker worked as a conductor in Alliance, Nebraska. Merker had a 'layoff threshold'—meaning days she could be off of work—of 7.5 weekdays and 3 weekend days under the Attendance Guidelines." Filing 30-12 at 3. The EEOC has not pointed to any evidence demonstrating this was not Merker's "layoff threshold." The hearing officer determined that, for

---

[4] Merker's Employee Transcript also shows her medical leave, which was the basis for cancelling the January 8, 2022, investigation hearing and discipline. Filing 30-7 at 2.

the period of November and December 2021 and January 2022, Merker was unavailable 6 weekdays and 4 weekend days, which meant that she exceeded her weekend threshold by 1 day. Filing 30-1 at 2. The hearing officer determined that Merker should be terminated. He stated that his reasons for not granting Merker leniency were that (1) she had two active attendance violations from 2019 and an active Level S violation; (2) she had already received a 20-day record suspension and the next step was dismissal;[5] and (3) she had a lengthy history and pattern of attendance violations since 2013. Filing 30-1 at 6. In light of Merker's attendance history, the Court cannot find that imposing termination for exceeding her attendance threshold, even if only by one day, suggests that her termination was retaliatory.

Consistent with BNSF policy, and because Merker "stood for dismissal" as the next level of progressive discipline, the hearing officer referred the matter to the Labor Relations "PEPA team." Filing 30-1 at 6. In this instance, the PEPA team supported Merker's dismissal. Filing 30-1 at 6. Therefore, the hearing officer directed Jeff Stevens, the Terminal Superintendent for Alliance, to notify Merker by certified mail of the termination of her employment. Filing 30-1 at 6.

Merker's termination letter, captioned "Dismissal," is dated March 29, 2022. Filing 30-9, and states that the reason for dismissal was "absence from duty in excess of the Attendance Guidelines for the three month period ending January 2022." Filing 30-9. Merker declares that she received notice of her termination by certified mail on or about April 2, 2022. Filing 25-1 at 2. Merker's name appeared on a list of terminated and retired employees on or about March 29, 2022. Filing 25-1 at 2; Filing 25-4 at 1. As BNSF points out, however, a later list for April 16, 2022,

---

[5] The Court notes that Merker's Discipline Record shows that her last discipline prior to termination was actually a 30-day suspension. Filing 30-7 at 2. As explained, above, in the body of this decision, that 30-day suspension was an act of "managerial leniency."

listed 841 people and did not state the reason the employee was listed. Filing 30-1 at 7. The EEOC has not pointed to any evidence that a list posted March 29, 2022, would have been materially shorter or would have contained any different information concerning the reasons employees were listed.

### 3.  There is No Evidence of Retaliatory Discharge

BNSF points out that the hearing officer who chose termination as the appropriate discipline for Merker was not an employee at the Alliance railyard. Instead, BNSF appointed Wyatt Orton, the BNSF's Assistant Terminal Superintendent for Denver, to serve as hearing officer for the matter involving Merker. Filing 30-1 at 1. Mr. Orton declares that he was not aware of this lawsuit, or Merker's allegations of harassment, or that she was named in a lawsuit brought by the EEOC against BNSF until the union representative brought up these facts during the investigation hearing. Filing 30-1 at 7. Mr. Orton also declares that he does not report to Jeff Stevens, the Terminal Superintendent at Alliance, nor does Mr. Stevens report to Mr. Orton. Filing 30-1 at 2. Finally, Mr. Orton declares that he "understood [Mr. Stevens] wanted someone from outside of Alliance, Nebraska, to conduct the hearing to avoid any appearance of bias," and that he did not know Merker and had not met her prior to the investigation hearing. Filing 30-1 at 2. The EEOC has presented no evidence to rebut these parts of Mr. Orton's declaration.

Nevertheless, the EEOC suggested at the TRO hearing that, because Jeff Stevens asked Mr. Orton to conduct the investigation hearing, Mr. Stevens may have used Mr. Orton as a "cat's paw" to effect a retaliatory termination. Filing 32 at 54. The Court finds that there is no evidence of retaliatory intent by either Mr. Stevens or the PEPA team that ratified Mr. Orton's decision to terminate Merker, so there is no evidence that might support a "cat's paw" theory.

The EEOC also points out that a union representative declares that the only conductors at the Alliance railyard that BNSF disciplined for "low performance" attendance violations from

October 2021 to the present were Merker and another woman who had complained about sex discrimination. Filing 25-2 at 3. The BNSF points to the declaration of Ms. Sherlock that, in the 12-month period from February 1, 2021, through January 31, 2022, twenty-three employees in the Powder River Division, of which the Alliance railyard is a part, were disciplined for low performance, and of those, 19 were men and 4 were women. Filing 30-13 at 3. She declares that, in Alliance, Nebraska, two were men and two were women, one of whom was Merker. Filing 30-13 at 3. The EEOC responded at the TRO hearing that only the treatment of employees in the Alliance railyard is at issue in and relevant to this lawsuit, which the Court finds has some merit. Mr. Stevens's declaration, submitted in BNSF's supplemental index, states that, for 2019 through the first quarter of 2022, five TYE employees in the Alliance railyard, one woman (Rena Merker) and four men were terminated for attendance violations. Filing 34-1 at 4. Whether the Court considers treatment of employees in the Alliance railyard or those in the Powder River Division, and whether Merker was the only female TYE employee or one of two female TYE employees at the Alliance railyard terminated for attendance issues from 2019 through the first quarter of 2022, the evidence is simply insufficient for the Court to conclude that there is differential treatment between similarly situated male and female employees with regard to "low performance" or attendance issues. This is because, among other reasons, there is insufficient evidence to determine whether the employees identified are similarly situated in all relevant ways except gender.

In short, the Court concludes there is little or no evidence suggesting Merker's termination was retaliatory.

### 4. The Reactions of Merker and Other Female Employees

Merker declares that she has been "inconsolable" since her termination and has suffered hair loss, sleepless nights, and constant anxiety. She declares, further, that her distress has been compounded by the emotional burden of constant contacts from other female employees who are

18

afraid to tell anyone else what has happened to them. She also is at risk of losing her home and her horses, she has had to sell some horses to pay her bills, and she is considering filing for bankruptcy. Filing 25-1 at 2.

Merker declares that, after her termination was made public, other BNSF employees immediately flooded her with calls and texts about her dismissal. Filing 25-1 at 2. Prior to the TRO hearing, the EEOC provided anonymous declarations of two female employees, unredacted copies of which the Court reviewed *in camera*. These female employees declare that they have also suffered sexual harassment, but that, because Merker has been terminated, they are now too afraid to participate in the EEOC's lawsuit as either claimants or witnesses. Filing 25-3 at 1; Filing 25-4 at 1.

"Witness A" declares that she will never be able to care for her family, for which she is the sole breadwinner, if she loses her job at BNSF, because work at a comparable salary in the area is impossible to find. Filing 25-3 at 1–2. She also states that, during her employment with BNSF, she has suffered fear of retaliation and unfair treatment. Filing 25-3 at 32. "Witness B" likewise declares that her income is irreplaceable in the area where she lives, so if she loses her job, she will be unable to provide financially for her family. Filing 25-4 at 2. She also opines that she believes other female employees will be too fearful of retaliation and possible termination to provide information to or cooperate with the EEOC. Filing 25-4 at 2. Finally, "Witness C" submitted a declaration with the EEOC's supplemental materials, and the EEOC provided an unredacted copy for the Court's review. Witness C declares that she also is afraid to cooperate with the EEOC. Filing 39-1 at 1–2. She does not state that she has suffered any retaliation, but she does declare that she has "seen and heard about" retaliation against other unidentified employees at unidentified times. Filing 39-1 at 2.

The Court mentions these "anonymous" declarations for the sake of completeness. BNSF challenged their use in the TRO hearing and extensively in its supplemental brief, Filing 33 at 8–11, while the EEOC argues extensively in its supplemental brief that it can properly use such declarations with the identity of the declarant concealed from BNSF, but revealed to the Court *in camera*. Filing 38 at 5–9. The Court doubts that it can properly rely on these declarations. In any event, the Court has found that these declarations ultimately are not determinative of the disposition of the EEOC's request for a TRO.[6]

The EEOC has provided no evidence that any female employee who could be a witness or otherwise cooperate in this lawsuit or the EEOC's investigation has actually suffered retaliation in the wake of Merker's termination.

### C.  The EEOC's TRO Request

The EEOC asks this Court to enter a TRO under Federal Rule of Civil Procedure 65 to restore the *status quo ante* by immediately returning Merker to work and prohibiting BNSF from engaging in any retaliatory action against employees who cooperate with or provide information to the EEOC in support of this lawsuit. Filing 25 at 1. More specifically, the EEOC requests that the Court enter a TRO enjoining BNSF as follows: (1) requiring BNSF to reinstate Rena Merker to her job as a BNSF Conductor under the same terms and conditions under which she was employed prior to March 29, 2022; (2) prohibiting BNSF from taking or threatening discretionary adverse employment actions against Merker, other female employees, or any BNSF employee who seeks to cooperate with or provide information to the EEOC or participate in this lawsuit as a potential aggrieved individual or a witness; and (3) requiring BNSF to publicize the Court's order

---

[6] The use of such declarations runs counter the concept of an open judicial system embraced in this country and concepts of fairness to litigants. Moreover, the EEOC had alternatives to such "anonymous" declarations, including petitioning for a protective order either at or before the TRO hearing.

to all employees at the Alliance, Nebraska, facility to ensure they are aware of the protection granted by the order. Filing 25 at 15. The EEOC also requests that the Court set a briefing schedule on the EEOC's motion for preliminary injunction and schedule an expedited hearing in this matter. Filing 25 at 15.

## II. DISCUSSION

### A. Applicable Standards

#### 1. *Rule 65 Standards*

Rule 65 of the Federal Rules of Civil Procedure provides, in pertinent part, "The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney." Fed. R. Civ. P. 65(b)(1). Thus, Rule 65(b)(1) imposes significant requirements for a TRO issued without notice. Fed. R. Civ. P. 65(b)(1); *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (noting that there is a material difference between a TRO and a preliminary injunction in the allowed duration and the requirement of notice). In this case, however, the EEOC has provided notice of its request for a TRO, the Court has provided notice to both parties of a hearing on that request, and both parties were represented by counsel at the TRO hearing. Nevertheless, the court will assume that any TRO issued in this instance will still need to adhere to the durational limits of Rule 65(b).

Rule 65(b) does not identify the standard the Court must apply in deciding whether or not to grant a request for a TRO. "[T]he standard for analyzing a motion for a temporary restraining order is the same as [the standard for] a motion for a preliminary injunction." *Tumey*, 27 F.4th at 665. Thus, to obtain either a TRO or a preliminary injunction, "'[a] plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Tumey*, 27 F.4th at 664 (bracketed numbers inserted) (quoting

21

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), and also citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).[7] No single factor is dispositive. *Id. at 665*. Furthermore, a TRO is an extraordinary remedy never awarded as of right; the primary function of a TRO is preserving the *status quo* until the district court has an opportunity to grant full effective relief; and requiring a non-movant to take affirmative action goes beyond the purpose of a TRO. *Id.* Lastly, the burden of establishing the propriety of a TRO is on the movant. *Id.*

　　*2. Section 706(f)(2) Standards*

　　Title VII also includes a provision that expressly provides the EEOC with authority to seek a TRO or preliminary injunction, in certain circumstances. Section 706(f)(2) of Title VII provides as follows:

> (2) *Whenever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary investigation that prompt judicial action is necessary to carry out the purposes of this Act, the Commission*, or the Attorney General in a case involving a government, governmental agency, or political subdivision, *may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure.* It shall be the duty of a court having jurisdiction over proceedings under this section to assign cases for hearing at the earliest practicable date and to cause such cases to be in every way expedited.

42 U.S.C.A. § 2000e-5(f)(2) (emphasis added).

---

[7] Courts in this Circuit have, for decades, called the considerations for determining whether to grant a TRO or a preliminary injunction the "*Dataphase* factors," set out in *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc). The much more recent statements of the pertinent considerations by the Supreme Court in *Winter* and by the Eighth Circuit Court of Appeals in *Tumey*, while identifying the same considerations, give them sufficiently different definition to warrant reference to the "*Winter* factors" rather than the "*Dataphase* factors." *Compare Winter*, 555 U.S. at 20 (as quoted in the body of this decision), *with Dataphase*, 640 F.2d at 114 ("[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.").

BNSF argues that the EEOC fails to satisfy the requirements of this statute, because the EEOC has not shown that there is an administrative charge alleging retaliation and that the EEOC has conducted a preliminary investigation of that charge. Filing 29 at 1-2. Indeed, at the TRO hearing, the BNSF suggested that, because of the limited authority granted the EEOC to seek preliminary relief under § 706(f)(2), the EEOC does not have the broad authority to seek a TRO on any other basis. Filing 32 at 52. At the TRO hearing, the EEOC responded that there are decisions indicating that, where the EEOC is already involved in litigation, it has the authority to seek temporary relief pursuant to Rule 65. Filing 32 at 53. The EEOC cited some of the cases that it believes support its position in its supplemental brief. Filing 38 at 2. Indeed, in both of their supplemental briefs, the parties devote considerable attention to the question of whether or not § 706(f)(2) is the exclusive means by which the EEOC may obtain preliminary injunctive relief. Filing 33 at 6–8; Filing 38 at 1–2.

As another district court in the Eighth Circuit has recognized,

> "[O]nce the EEOC decides to sue in its own name, it is not limited to the facts presented in the charge." *[EEOC v.] Waffle House, Inc*., 193 F.3d [805,] 810 [(4th Cir.1999), *rev'd on other grounds*, 534 U.S. 279 (2002)]. "Rather, the EEOC may sue based on '[a]ny violations that [it] ascertains in the course of a reasonable investigation of the charging party's complaint.'" *Id.*. (quoting *General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 331, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)).

*EEOC. v. Am. Home Prod. Corp*., 165 F. Supp. 2d 886, 908 (N.D. Iowa 2001). As that court also recognized, prerequisites to a suit under § 706(f)(1), 42 U.S.C. § 2000e-5(f)(1), such as investigation, determination of reasonable cause, and an effort at conciliation, "'do not apply to a § 706(f)(2) [42 U.S.C. § 2000e-5(f)(2)] civil action for preliminary relief.'" *Id.* at 908 n.7 (quoting *EEOC v. Henry Beck Co*., 729 F.2d 301, 303 n.7 (4th Cir. 1984)).

23

This Court is inclined to believe that Rule 65 provides a proper avenue for the EEOC to seek temporary or preliminary relief when it is already involved in litigation, because once the EEOC decides to sue in its own name, it is not limited to the facts presented in the charge. *See id.* at 908. It appears that § 706(f)(2) is a special authorization for the EEOC to seek temporary relief prior to litigation, not the exclusive authority for the EEOC to seek such relief in any circumstances. This Court does not see any persuasive reason why the EEOC should not have access to the remedies or procedures, such as temporary relief pursuant to Rule 65, available to any other litigant in federal court. Nevertheless, the Court need not decide this question, because the Court concludes that the EEOC is not entitled to any temporary relief, whether under the authority on which it sought relief, Rule 65, or under § 706(f)(2). This is so, because the same considerations that lead the Court to deny preliminary relief under Rule 65 would necessarily lead the Court to deny preliminary relief under § 706(f)(2), which expressly incorporates Rule 65 requirements.

Therefore, the Court next turns to application of the Rule 65 standards to the EEOC's request for a TRO.

### B.  Application of The Standards

#### 1.  *The EEOC Has Not Shown Likelihood of Success on The Merits*

The first *Winter* factor is the movant's likelihood of success on the merits. *Tumey*, 27 F.4th at 664. The Eighth Circuit Court of Appeals has stated "that '[w]hile no single factor is determinative, the probability of success factor is the most significant.'" *Id.* at 665 (quoting *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up)). This factor requires the movant to demonstrate "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1041 (8th Cir. 2016)). A "fair chance of success" also requires "an

adequate showing of a nexus between the unlawful conduct and the responsible individuals." *Tumey*, 27 F.4th at 667.

The likelihood of success is considered in light of the elements of the movant's claim. *See, e.g.*, *301, 712, 2103 & 3151 LLC v. City of Minneapolis*, 27 F.4th 1377, 1383 (8th Cir. 2022) (analyzing likelihood of success in light of the elements of the movant's "takings" claim). Here, the claim that the EEOC has pleaded in its Amended Complaint, and the claim that has survived BNSF's motion to dismiss, is a claim on behalf of Merker that she was subjected to a sexually hostile work environment. In support of its request for a TRO, however, the EEOC argues that it is likely to succeed in proving BNSF fired Merker in retaliation for the EEOC's lawsuit based on her charge of discrimination. Filing 25 at 8. This claim is not in the Amended Complaint, even though Merker originally included retaliation in her administrative charge, Filing 10-1 at 2, and the EEOC's letter of determination to BNSF stated that the EEOC had reasonable cause to believe that BNSF violated Title VII because Merker and other female employees at BNSF's Alliance location had been disciplined in retaliation for complaining of the sexual harassment, as well reasonable cause to believe BNSF had violated Title VII because of sexual harassment. Filing 10-2 at 1. Nevertheless, the Court will consider the EEOC's request for a TRO premised on retaliation, where the alleged retaliation is a violation that the EEOC contends it has now ascertained in the context of this lawsuit. *Cf. Am. Home Prod. Corp.*, 165 F. Supp. 2d at 908.

To succeed on a Title VII retaliation claim, the plaintiff must prove (1) she participated in protected conduct, (2) she suffered an adverse employment action, and (3) her employer's impermissible retaliatory motive was the "but-for cause" of the adverse employment action. *Donathan v. Oakley Grain, Inc*., 861 F.3d 735, 739 (8th Cir. 2017) (explaining the prima facie case and the ultimate showing required to prevail). There can be no dispute that participating as a

named "aggrieved person" in an action brought by the EEOC is participation in protected conduct, nor can there be any dispute that termination is an adverse employment action. Indeed, the EEOC's response brief focused on the likelihood that the EEOC can show that Merker's termination was causally related to retaliation. Filing 29 at 24–26. Thus, the key issue for determining the EEOC's likelihood of success on a retaliation claim on Merker's behalf is whether the EEOC has a "fair chance" of showing the required causal connection. *Donathan*, 861 F.3d at 739 (final element of a retaliation claims); *Wildhawk Invs., LLC*, 27 F.4th at 593 (explaining that "likelihood of success" means a "fair chance" of prevailing).

In its supplemental brief, the EEOC reiterates its contention that it has shown a causal connection between Merker's protected activity and her termination based on temporal proximity of these events and BNSF's inconsistent enforcement of its attendance policy. Filing 38 at 10. The Court disagrees.

Contrary to the EEOC's argument, BNSF did not begin taking adverse actions against Merker after the EEOC filed suit by disciplining her initially for alleged "low performance" attendance violations and then repeatedly retaliated against her over several months for alleged violations of Attendance Guidelines. Filing 25 at 8. Rather, Merker's Discipline Record shows that Merker had a long-running series of attendance problems that resulted in discipline, beginning less than eighteen months after she was hired on October 31, 2011. Filing 30-7 at 1–2. Indeed, in October 2012, during Merker's first year of employment, before any instance of discipline in her Discipline Record, Merker had been "coached" and "counseled" by Mr. Snyder for "low performance." This happened even though Merker could have received a formal reprimand instead. Filing 30-13 at 2. Merker was then disciplined twelve times for attendance issues in her ten-and-a-half years of employment prior to her termination, and in nine of those instances, she

signed a waiver admitting the violation. Filing 30-7 at 1–2. The EEOC has not argued or offered evidence that Merker was subjected to any "retaliatory" discipline prior to the filing of this lawsuit, even though Merker included allegations of "retaliation" in her administrative charge. Filing 10-1 at 2. Also, because Merker knew of and had successfully pursued a review by the PLB of one instance of discipline, in 2017, *see* Filing 30-7 at 1–2, it is unlikely that she could convincingly argue that challenging prior discipline as retaliatory would have been so futile that she did not attempt it. Thus, the EEOC's reliance on temporal proximity to show retaliation is completely undercut by Merker's actual Discipline Record showing a lengthy history of attendance problems.

Furthermore, as the Court observed repeatedly in its statement of the factual background, the EEOC has failed to marshal evidence that suggests Merker's termination was retaliatory or that her termination for attendance problems was a pretext for retaliation. The hearing officer, Mr. Orton, has provided a reasonable explanation for his decision to terminate Merker, that is, her attendance violation in January 2022. Filing 30-1 at 2. He also provided a reasonable explanation for withholding leniency, that is, Merker's active violations, prior 20-day record suspension for which the next step could be dismissal, and her lengthy history and pattern of attendance violations. Filing 30-1 at 6. The EEOC has produced no evidence to contradict Mr. Orton's declaration that he did not know Merker or know anything about the EEOC's lawsuit until Merker brought it up at her investigation hearing. Filing 30-1 at 2. Mr. Orton's decision was also reviewed and approved by the independent PEPA team, Filing 30-12 at 2, thus strongly suggesting that it complied with applicable policies and was not retaliatory. As indicated in the factual background, the Court does not agree with the EEOC that other evidence the EEOC asserts in its supplemental brief is sufficient to demonstrate the causal link between Merker's protected activity and her termination or to establish that attendance problems are a pretext for Merker's retaliatory termination. That

evidence, either taken separately or as a whole, is insufficient to suggest a likelihood of success on the merits of a retaliation claim.

To attempt to rebut this conclusion, the EEOC suggests that Mr. Orton acted as a "cat's paw" for Mr. Stevens, the Terminal Superintendent for the Alliance railyard. The EEOC reiterated this contention in its supplemental brief, but only to the extent of reiterating that Mr. Orton was "hand-picked" as Merker's hearing officer by Mr. Stevens. Filing 38 at 12. The Eighth Circuit has explained,

> "[C]at's-paw refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Pribyl v. Cnty. of Wright*, 964 F.3d 793, 797 (8th Cir. 2020) (alteration in original) (citation omitted). Under a cat's paw theory, "an employer may be vicariously liable for an adverse employment action if one of its agents—other than the ultimate decision maker— is motivated by discriminatory animus and intentionally and proximately causes the action." *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013).

*Muldrow v. City of St. Louis Missouri*, 30 F.4th 680, ___ (8th Cir. 2022) (pagination not yet available). The Eighth Circuit observed that the person with the alleged discriminatory animus and the decisionmaker for the defendant sued for discrimination are usually part of the same entity. *Id.* While Mr. Orton, the decisionmaker, and Mr. Stevens, the person who allegedly harbored a retaliatory animus toward Merker, are both BNSF employees, they are employed by different divisions with no superior/subordinate relationship between the two of them. Filing 30-1 at 2. Furthermore, the Court has not been presented with any evidence suggesting or demonstrating that Mr. Stevens harbored any retaliatory animus toward Merker. *Muldrow*, 30 F.4th at ___ (pagination not yet available). Finally, the review by the PEPA team was by yet another "decisionmaker" that appears to be entirely insulated from any influence by Mr. Stevens. *Id.*; *see also Singer v. Harris*,

897 F.3d 970, 979 (8th Cir. 2018) (explaining that a "cat's paw" theory does not fit a case in which the ultimate decisionmaker makes an independent determination).

The hearing officer's rationale has not been rebutted by the EEOC sufficiently, if at all, to give the EEOC any likelihood of demonstrating the causal connection to a retaliatory animus required to show a fair chance of success on the merits of a retaliation claim. *Donathan*, 861 F.3d at 739 (final element of a retaliation claims); *Wildhawk Invs., LLC*, 27 F.4th at 593 (explaining the "likelihood of success" factor). Thus, the "likelihood of success" *Winter* factor weighs firmly against the EEOC's TRO request.

Even though the Eighth Circuit has reiterated, after *Winter*, 555 U.S. at 20, that no single *Winter* factor is dispositive, *Tumey*, 27 F.4th at 665, it is difficult to imagine why a court would grant a TRO when it finds that the movant has little or no chance of success on the merits. Nevertheless, the Court will consider the next *Winter* factor as well.

## 2. *The EEOC Has Not Shown Irreparable Harm*

The next *Winter* factor is whether it is likely that the EEOC will suffer irreparable harm in the absence of preliminary relief. *Tumey*, 27 F.4th at 664. The movant must show that "irreparable injury is *likely* in the absence of an injunction, not merely a 'possibility' of irreparable harm before a decision on the merits can be rendered." *Id.* at 664–65 (quoting *Winter*, 555 U.S. at 20). "The failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'" *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

Before addressing other issues concerning this factor, the Court concludes that it is appropriate to address two of BNSF's arguments: lack of emergency/undue delay, and disturbance of the *status quo*.

a.   The EEOC Has Failed to Demonstrate an Emergency

BNSF argues that, because a TRO requires a showing of irreparable harm, the movant must act with reasonable diligence. This is so, BNSF argues, because a long delay after learning of a threatened harm indicates that the threat is not serious enough or imminent enough to justify preliminary relief. Filing 29 at 12. Here, BNSF points out that the EEOC waited more than two weeks between Merker's termination and the filing of its request for a TRO, demonstrating that there is no immediate and irreparable harm. Filing 29 at 13. Furthermore, BNSF argues, even before Merker's termination, BNSF had notified her of the disciplinary investigation for her apparent rule violation on February 11, 2022. BNSF then originally scheduled the investigation hearing on February 23, 2022, so that the EEOC had ample opportunity to intervene to enjoin any termination. Filing 29 at 13.

At the TRO hearing, the EEOC argued that any delay was the result of bureaucratic delay, because local attorneys for the EEOC were required to obtain permission to seek a TRO from higher echelons in the Commission. *See, e.g.,* Filing 32 at 8. In its supplemental brief, the EEOC argues that it did not have notice of Merker's possible termination from the February 11, 2022, because the notice was not provided to the EEOC and, in any event, the notice does not mention possible termination. The EEOC also argues that it was not present at the March 18, 2022, investigation hearing where possible termination was discussed, so it simply did not get notice of Merker's termination until April 2, 2022, when Merker received the termination letter. Filing 38 at 3. The EEOC argues BNSF cannot insulate a dismissal from challenge by making it "effective immediately" when neither the terminated employee nor the EEOC had yet received notice of the termination. Filing 38 at 4. Finally, the EEOC argues that its purported delay was not as long as the delay in cases on which BNSF relies.

As the Eighth Circuit Court of Appeals has explained,

30

> Without question, "[a] long delay by plaintiff after learning of the threatened harm ... may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction." Wright & Miller, *11A Fed. Prac. & Proc.*, § 2948.1 & n.13 (3d ed. 2013); *see Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir. 1999). "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, ——— U.S. ———, 138 S. Ct. 1942, 1944, 201 L.Ed.2d 398 (2018).

*Adventist Health Sys./SunBelt, Inc. v. United States Dep't of Health & Hum. Servs.*, 17 F.4th 793, 805 (8th Cir. 2021).

The Court finds it questionable whether the bureaucratic excuse is sufficient under the law to justify a delay in filing a TRO. If the EEOC wishes to file TRO actions, it must comply with the law to do so. This means it must find a way to timely file a TRO, just as any other party must do in order to obtain immediate relief from the Court.

Here, the considerable delay between notice to Merker in February 2022 that she faced a disciplinary proceeding that could result in termination and the TRO request on April 14, 2022, suggests to this Court that the purported harm to Merkel was not serious enough to justify immediate relief from the Court. No later than the investigation hearing on March 18, 2022, Merker claimed that the disciplinary notice was in retaliation for the filing of this lawsuit. Filing 30-2 at 51. Indeed, Merker declares that, at an investigation hearing on November 3, 2021, concerning the September "low performance" notice, she told BNSF that she believed that BNSF was taking action against her because of the EEOC's lawsuit. Filing 25-1 at 1, 6–7. Furthermore, the Court is not persuaded by the EEOC's argument that it did not know that termination was a possibility in Merker's case. At least as far back as the notice of the imposition of discipline on November 12, 2021, Merker knew that termination was a possible result of a further attendance violation. Filing 25-1 at 8. The EEOC certainly knew or should have known from Merker's Discipline Record, Filing 30-7, well before Merker was terminated that the BNSF had a progressive discipline system

and that Merker was moving up the levels of discipline toward termination. Thus, the EEOC was or certainly should have been aware of the possibility of an allegedly retaliatory termination or other retaliatory action long before Merker received the termination letter.

Under these circumstances, the Court cannot conclude that the EEOC acted with reasonable diligence, and its delay in seeking temporary relief undercuts a claim of a threat of irreparable harm. *Adventist Health Sys*, 17 F.4th at 805.

> b.   A TRO is Unlikely to Preserve the *Status Quo*

At the TRO hearing, BNSF argued that, at the time the EEOC filed its request for a TRO, the *status quo* was that Merker had been terminated some few weeks earlier, so that the proper time to seek a TRO to prevent any threat of irreparable harm would have been *before* Merker was terminated, for example, when she received notice of an attendance violation that could lead to her termination. Filing 32 at 47–48. The EEOC does not respond to this contention in its supplemental brief.

There is some merit to BNSF's argument. The primary function of a TRO is preserving the *status quo* until the district court has an opportunity to grant full effective relief, while requiring a non-movant to take "affirmative action" goes beyond the purpose of a TRO. *Tumey*, 27 F.4th at 665. For example, in *Grasso Enterprises, LLC v. Express Scripts, Inc*., 809 F.3d 1033 (8th Cir. 2016), the court held that a TRO or preliminary injunction that requires substantially the relief sought after a trial on the merits—in that case, barring implementation of a program to deny benefits for "compound drugs"—was improper "affirmative action." 809 F.3d at 1041 n.4. Similarly, requiring a manufacturer to send a notice to all its customers indicating that it had falsely labeled its products before that issue had been decided on the merits was improper preliminary injunctive relief. *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co*., 997 F.2d 484, 490 (8th Cir. 1993). Here, where Merker had notice of possible termination for months and had already

been terminated a few weeks before the EEOC requested a TRO, she is seeking substantially the relief of reinstatement that she might obtain after a trial on the merits. *Cf. Grasso Enterprises*, 809 F.3d at 1041 n.4; *Sanborn Mfg. Co.*, 997 F.2d at 490. To put it another way, what the EEOC seeks is not proper preliminary injunctive relief—prevention of a retaliatory decision to annul the threat of irreparable harm and to maintain the *status quo*—but "affirmative relief"—requiring BNSF to take action by reinstating Merker, even if only during the pendency of the TRO. *See Tumey*, 27 F.4th at 665 (explaining that requiring a non-movant to take "affirmative action" goes beyond the purpose of a TRO). Nevertheless, courts have considered temporary or preliminary injunctive relief in the form of reinstatement of employment, at least where the plaintiff suffers injury that cannot be remedied by money damages, as explored further, below. *See, e.g., E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005); *EEOC v. Anchor Hocking Corp.*, 666 F.2d 1037, 1043 (6th Cir. 1981).

While there is some merit to BNSF's "*status quo*" argument, the Court finds that there are more substantial grounds on which to deny the EEOC's request for a TRO.

> c. The EEOC Has Not Demonstrated Irreparable Harm from Merker's Termination

Turning to more typical concerns with the "irreparable harm" requirement for a TRO, the Eighth Circuit has explained, "'Economic loss, on its own, is not an irreparable injury so long as the losses can be recovered'"—*i.e.*, can be recompensed by money damages. *Wildhawk Invs., LLC*, 27 F.4th at 597 (quoting *DISH Network Serv. L.L.C. v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013)). More specifically, when a party seeks preliminary relief in the form of reinstatement of employment, the court asks whether termination will hurt a plaintiff in a way that cannot be remedied by money. *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d

700, 704 (7th Cir. 2005). Also, as the Sixth Circuit Court of Appeals recognized four decades ago, in the context of an EEOC request for a preliminary injunction,

> The irreparable injury which must be established under § 706(f)(2) may be, as the district court held, to the EEOC or to the charging party. The Commission can obtain relief by showing, e.g., that the charging party will in fact suffer irreparable harm if he is not reinstated. It can also obtain relief by, e.g., showing that in fact its ability to prosecute the pending charge has been impeded by the alleged retaliation through the "chilling" effect on other employees' willingness to cooperate in the investigation.

*EEOC v. Anchor Hocking Corp.*, 666 F.2d 1037, 1043 (6th Cir. 1981). The Court will assume that, in the context of an application for a TRO pursuant to Rule 65 in a lawsuit that the EEOC has already brought, the EEOC may also rely on a threat of irreparable harm either to the EEOC or to the party or parties on whose behalf the EEOC has brought suit.

Here the EEOC argues in its supplemental brief, as it did at the TRO hearing, that emotional and psychological distress are irreparable harms. Filing 38 at 9–10. The Court is cognizant of the EEOC's claims that Merker's termination will cause her non-economic distress beyond mere loss of employment, including inability to support her family and potential bankruptcy, which Merker contends will not be fully remedied by money damages. Nevertheless, the Court declines to rule that these harms, standing alone, are irreparable harms sufficient to warrant the TRO the EEOC seeks. *Cf. E. St. Louis Laborers' Loc. 100*, 414 F.3d at 704 (explaining that, when a party seeks preliminary relief in the form of reinstatement of employment, the court asks whether termination will hurt a plaintiff in a way that cannot be remedied by money).

The EEOC also argues in its supplemental brief, as it did at the TRO hearing, that there is sufficient evidence of a "chilling" effect on its ability to investigate and prosecute this lawsuit. Filing 38 at 5–9. The Court also finds insufficient to satisfy the "irreparable harm" factor the "chilling" effect of Merker's termination on other employees' willingness to cooperate in the

34

EEOC's investigation and the trial of the claims before the Court. It is true that the EEOC has produced declarations from three other female employees who had previously been willing to cooperate and possibly even testify in these proceedings, but who are now too afraid of retaliation by BNSF to do so. *See Anchor Hocking Corp.*, 666 F.2d at 1043. If such evidence from "anonymous" witnesses could properly be considered, this certainly could cause a potential "chilling" effect on the EEOC's enforcement efforts. This is so, because "under Title VII, 'whenever the EEOC chooses from among the many charges filed each year to bring an enforcement action in a particular case, the agency may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief.'" *EEOC. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 682 (8th Cir. 2012) (quoting *EEOC v. Waffle House, Inc*., 534 U.S. 279, 296 (2002)).

The insurmountable problem with demonstrating irreparable harm or the threat of irreparable harm, here, is that the EEOC cannot show the necessary causal connection between any wrongful conduct by BNSF and the irreparable harm it fears. The Court recognizes that the "irreparable harm" factor is framed in terms of whether the movant "'is likely to suffer irreparable harm in the absence of preliminary relief[.]'" *Tumey*, 27 F.4th at 664 (quoting *Winter*, 555 U.S. at 20). However, that formulation necessarily requires that the non-movant's wrongful conduct causes or would cause irreparable harm if that conduct is not enjoined. Where the Court concluded, above, that the EEOC had little or no likelihood of success on the merits of a claim that Merker's termination was retaliatory, the Court simply cannot grant a TRO on the basis of the "chilling" effect of a mistaken belief of other female employees that Merker's termination was retaliatory. Under such circumstances, there is no causal connection between any wrongful conduct by BNSF

that the EEOC has demonstrated it is likely to prove and the irreparable harm of a "chilling" effect that the EEOC has alleged.

The EEOC has failed to establish this *Winter* factor.

### 3. The Remaining Factors Are Not Dispositive

The third *Winter* factor is whether the balance of equities tips in the movant's favor, and the fourth and last *Winter* factor is whether an injunction is in the public interest. *Tumey*, 27 F.4th at 664. In this case, however, the Court need not consider these factors, because the EEOC's inability to demonstrate a likelihood of success or irreparable harm is fatal to its request for a TRO. *See Tumey*, 27 F.4th at 665 (reiterating "that [w]hile no single factor is determinative, the probability of success factor is the most significant." (internal quotation marks and citations omitted)); *Sessler*, 990 F.3d at 1156 ("The failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'" (quoting *Watkins Inc.*, 346 F.3d at 844)).

Thus, the *Winter* factors relevant in this case weigh decisively against the EEOC's request for a TRO.

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that

1.      Plaintiff EEOC's April 14, 2022, Motion For Temporary Restraining Order, Filing 24, is denied;

2.      The Court refers the following matters to Magistrate Judge Susan M. Bazis for prompt hearing and determination:

36

a.      the limits of discovery prior to a preliminary injunction hearing, if the parties are unable to agree;

b.      the determination of the scope of such limited discovery and any disputes concerning such limited discovery;

c.      the setting of a briefing schedule for final submission of the EEOC's Motion for Preliminary injunction; and

d.      the scheduling of a preliminary injunction hearing.


Dated this 28th day of April, 2022.


BY THE COURT:

s/ *Brian C. Buescher*
United States District Judge