IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | |
| Plaintiff, | **8:21CV369** |
| vs. | |
| BNSF RAILWAY COMPANY, | **MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | |

In this lawsuit, the Equal Employment Opportunity Commission (EEOC) alleges BNSF Railway Company (BNSF) subjected female train conductor Rena Merker to a sexually hostile work environment from 2011 to 2022 in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Filing 41 at 1. This matter is now before the Court on BNSF's Motion for Summary Judgment challenging all the EEOC's claims against BNSF. Filing 124. However, in its reply brief in support of its pending Motion for Summary Judgment, BNSF "inform[ed] the Court that Rena Merker passed away in January 2024." Filing 139 at 1 n.1. Consequently, the Court directed the parties to file supplemental briefs on the impact of Merker's death, if confirmed, on this lawsuit. Merker's death was confirmed by BNSF's filing of her Certificate of Death. Filing 150 (sealed). This Memorandum and Order addresses first the issues argued in the supplemental briefs and concludes that the EEOC can continue to prosecute this action despite Merker's

1

unfortunate death. However, upon consideration of BNSF's Motion for Summary Judgment, the Court concludes that BNSF's Motion for Summary Judgment must ultimately be granted.

## I. INTRODUCTION

### A. Summary of Ruling

As to the issues argued in the supplemental briefs, the Court concludes that this litigation can continue notwithstanding Merker's death, and the EEOC declares its desire to continue it in these circumstances. Therefore, the Court will consider BNSF's Motion for Summary Judgment.

The Court concludes that BNSF is entitled to summary judgment on all remaining claims because such claims are not actionable as a matter of law. In reaching this conclusion, the Court first addresses the standards it must apply when assessing Merker's claims—specifically, whether this is a "coworker harassment" case or a "supervisor harassment" case to which different standards for employer liability apply. The Court determines that this is a "coworker harassment" case rather than a "supervisor harassment" case because Alex Adam, Merker's coworker accused of boorish and inappropriate actions toward Merker, did not have the supervisory authority required to deem him a "supervisor" under Title VII.

The Court next considers whether alleged harassment that took place prior to the limitations date of March 23, 2017, is part of the EEOC's coworker harassment claim. Contrary to BNSF's contention, the Court concludes that the EEOC's Second Amended Complaint did not limit its harassment claim to conduct that occurred after March 23, 2017. On the other hand, the Court concludes that the EEOC's "continuing violation" theory seeking recovery for harassment prior to the March 23, 2017, limitations date fails as a matter of law. Thus, the EEOC's claim must be based on—and the EEOC can only recover for—harassment of Merker that occurred after March 23, 2017.

The Court next addresses BNSF's contention that the Court should not consider instances of harassment of which Merker was admittedly not aware when considering whether "the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult.'" *Walker-Swinton v. Philander Smith Coll.*, 62 F.4th 435, 439–40 (8th Cir. 2023). The Court concludes that applicable law allows consideration of instances of harassment of which Merker was not aware for two purposes: (1) to determine whether the environment was objectively hostile, and (2) to determine whether the employer had constructive knowledge of the hostile environment.

The Court then considers BNSF's argument that Merker cannot prove "unwelcomeness" of the alleged harassing actions for the EEOC to prevail on its claim because Merker did not report the harassment. The Court concludes that there is a question of fact as to whether Merker did enough to demonstrate the "unwelcomeness" of the alleged harassment.

The Court ends its analysis with a detailed review of all acts of alleged harassment against Merker that allegedly occurred within the limitations period. Upon this review, and consideration of the requirements of the law, the Court concludes that the EEOC's remaining EEOC claim for harassment is not actionable as a matter of law. The Court reaches this conclusion even though the alleged actions of Merker's coworkers were inappropriate, boorish, and even vile. Nothing in this decision should be taken as condoning or excusing such behavior; rather, this decision recognizes that the law sets a stringent and context-specific standard for actionable harassment.

### B. Factual Background

The parties have offered purportedly material factual allegations and responses to them in 152 paragraphs—some with numerous subparts. *See* Filing 134; Filing 140.[1] Nevertheless, the

---

[1] The Court cites the EEOC's Responses to Defendant's Statement of Material Facts, Filing 134, for both BNSF's allegations and the EEOC's responses. The Court cites BNSF's Reply to Plaintiff's Statements of Facts, Filing 140,

Court finds that a comprehensive statement of undisputed and disputed facts is not necessary in this case. Instead, the Court will set out here only enough of the parties' factual allegations to put in context the Court's discussion in Section II below of the potentially dispositive legal and factual matters. Unless indicated otherwise, the facts set out here are undisputed at least for purposes of summary judgment.

Plaintiff EEOC is a federal agency with authority to bring enforcement actions under Title VII of the Civil Rights Act of 1964. Filing 134 at 1 (¶ 1). Defendant BNSF, a Delaware corporation doing business in the State of Nebraska, is a Class I railroad operating in 28 states including Nebraska. Filing 134 at 1–2 (¶¶ 2–3). On October 31, 2011, BNSF hired Rena Merker as a conductor at its Alliance, Nebraska, railyard. Filing 134 at 2 (¶ 4).

Conductors like Merker, engineers, and yardmasters are coworkers. Filing 134 at 2 (¶ 5). 4–5 (¶¶ 16–17). As the Court previously explained, these employees are in the Train, Yard, & Engine (TY&E) craft. Filing 74 at 6. All are non-management, union-represented employees. Filing 134 at 4 (¶ 16). In contrast, management employees include both "first-line supervisors" (division trainmasters, senior trainmasters/road foremen of engines, and terminal trainmasters) and higher levels of management (terminal managers, assistant terminal superintendents, and terminal superintendents). Filing 134 at 5 (¶ 18). BNSF asserts that first-line supervisors do not have authority to make decisions such as hiring, promotion, demotion, assignments, reassignments, or issuance of discipline, and the EEOC agrees—with one exception. Filing 134 at 5 (¶ 19). The

---

for both the EEOC's allegations and BNSF's responses. BNSF's allegations are set out in ¶¶ 1–60. The EEOC's allegations are set out in ¶¶ 61–152.

EEOC asserts and BNSF disputes that "road foremen of engines" had authority to issue discipline to employees. Filing 134 at 5–6 (¶ 19) (response), 6 (¶ 22) (response).[2]

BNSF acknowledges that Merker testified that she was subjected to several kinds of conduct that she alleged resulted in a hostile work environment. The parties agree that on July 18, 2017, a male engineer named Mark Jones screamed angrily at Merker and used an obscenity when she asked why the train was going so slowly when she woke up after having "nodded off." Filing 134 at 8 (¶¶ 26–27). BNSF also acknowledges that Merker testified to numerous incidents of coworker harassment ranging from comments on her body, to suggestive statements and come-ons, to rumors that she was "sleeping around," to disparaging comments about women in general or their presence in the workplace. Filing 134 at 18 (¶ 45.a.–k.). The parties dispute whether Merker testified to eleven instances (by BNSF's count) or at least thirty instances (by the EEOC's count) of harassing coworker contacts during Merker's employment with BNSF. Filing 134 at 18–19 (¶ 46); *see also* Filing 134 at 25–32 (¶ 61.a.–ss.) (the EEOC's allegations of numerous incidents). BNSF objects to nearly all the EEOC's allegations of harassment as not properly supported, citing Federal Rule of Civil Procedure 56(c), or as immaterial or irrelevant. Filing 140 at 1–15 (¶ 61.a.–ss.).

BNSF also acknowledges that Merker testified that she was exposed to sexual or otherwise offensive graffiti in locomotives, train cars, and BNSF terminal buildings. Filing 134 at 19–20 (¶¶ 47.a.–c.). These incidents involved a penis drawn on an eyewash station in the women's locker room at a terminal, a fake camera in a locomotive restroom with "for research purposes only" written next to it, and drawings of a naked woman and a penis on a train above the seat where

---

[2] BNSF alleges that "[f]or many years, until approximately October of 2021, Alliance (and other BNSF locations) had a position called road foreman of engines." Filing 134 at 7 (¶¶ 24–25). Thus, that position no longer exists.

Merker was working. Filing 134 at 19–20 (¶¶ 47.a.–c.). The EEOC contends that there were other incidents involving photos of a naked female employee being distributed and the display of other sexually graphic photographs and graffiti, and BNSF objects to some of those allegations. *See, e.g.*, Filing 140 at 13 (¶ 61.mm.), 14 (¶ 61.rr.), 22 (¶ 91), 35 (¶ 144). BNSF also acknowledges that Merker testified that she had to "use locomotive restrooms that she believed were intentionally soiled by male employees to make them unsanitary and unusable for women." Filing 134 at 20 (¶ 50).

The EEOC alleges that from 2017 to 2020, female employees reported sexual harassment to BNSF at least seven times. Filing 140 at 16–17 (¶¶ 68–71) (identifying some of these incidents). In its responses to those allegations, BNSF disputes the relevance of harassment allegedly suffered by women other than Merker and whether Merker knew about it. Filing 140 at 16–17 (¶¶ 68–71) (responses). BNSF makes several additional allegations of facts about whether Merker reported incidents of sexual harassment, BNSF's response to Merker's complaints of hostile environment harassment, and the extent to which Merker's concerns were addressed, most of which the EEOC disputes. *See* Filing 134 at 13–25 (¶¶ 44–60).

### C.  Procedural Background

Merker filed an EEOC Charge of Discrimination on January 17, 2018, alleging that BNSF engaged in sexual harassment, sexual discrimination, and retaliation in violation of Title VII. Filing 134 at 2 (¶ 6); *see also* Filing 135-11 at 2 (charge). The EEOC alleges that it was unable to secure a conciliation agreement from BNSF that was acceptable to the EEOC, so on April 8, 2021, the EEOC issued a Notice of Conciliation Failure to BNSF. Filing 41 at 3 (¶¶ 13–14). The EEOC then filed its original Complaint in this action on September 23, 2021. Filing 1. However, the EEOC's operative pleading is now its Second Amended Complaint. Filing 41. The EEOC's lawsuit

alleges that Merker was subjected to a sexually hostile work environment at BNSF's Alliance railyard. Filing 41 at 1. The EEOC originally sought relief on behalf of "other aggrieved individuals" as well as Merker. Filing 41 at 1. However, after the EEOC's third attempt to plead a claim on behalf of female employees other than Merker, the Court granted BNSF's Motion to Dismiss in Part Plaintiff's Second Amended Complaint and dismissed with prejudice the EEOC's claim on behalf of female employees other than Merker. Filing 74.

The remaining claim in the Second Amended Complaint alleges, "The sexually offensive comments, jokes, graffiti and other conduct toward Merker . . . w[ere] unwelcome, intentional, severe, pervasive, and created a sexually hostile working environment." Filing 41 at 17 (¶ 97). The sexual harassment claim alleges further, "Although Merker . . . notified management of the unwanted offensive sexual comments and behavior, Defendant failed to take prompt, effective remedial action to end the harassment." Filing 41 at 18 (¶ 99). The EEOC sought various kinds of relief on behalf of "aggrieved women," but on Merker's behalf, it seeks an award making Merker "whole" for past and future pecuniary and non-pecuniary losses, Filing 41 at 18 (Prayer, ¶ C); punitive damages, Filing 41 at 19 (Prayer, ¶ D); and "such other and further relief as this Court deems necessary and proper in the public interest," Filing 41 at 19 (Prayer, ¶ E). Finally, the EEOC seeks an award of its costs in this action. Filing 41 at 19 (Prayer, ¶ F).

In due course, BNSF filed the Motion for Summary Judgment now before the Court. Filing 124. BNSF seeks summary judgment "on all of Plaintiff's claims against BNSF." Filing 124 at 1. As mentioned above, in the briefing of that Motion, BNSF notified the Court that Rena Merker passed away in January 2024. Filing 139 at 1 n.1. In light of that information, the Court ordered supplemental briefing on the impact of Rena Merker's death on this litigation, in which the EEOC is limited to seeking relief on her behalf rather than on behalf of "other aggrieved individuals" as

well. Filing 142. The parties filed the supplemental briefs as required on March 5, 2024. *See* Filing 146; Filing 148.

## II. LEGAL ANALYSIS

### A. The Impact of Rena Merker's Death

In its Order for supplemental briefing concerning the impact of Rena Merker's death, the Court ordered "that the parties shall each file a supplemental brief . . . addressing (1) whether the EEOC can legally continue to prosecute this lawsuit, (2) whether it is appropriate for the EEOC to do so, (3) what evidentiary complications are presented, and (4) what relief the EEOC may now be able to obtain if this lawsuit can continue." Filing 142 at 2. The Court now concludes that the only question it must answer is the first one. Specifically, if the EEOC cannot legally continue to prosecute this lawsuit, the case would end, and there would be no reason either to answer the other questions or to consider BNSF's Motion for Summary Judgment. On the other hand, because the Court concludes that the EEOC can legally continue to prosecute the case, the Court's conclusion in § II.B. below that BNSF's Motion for Summary Judgment must be granted moots the remaining questions that the Court posed.

#### 1. The Parties' Arguments

The EEOC's general position is that it litigates in the public interest, even when it seeks relief for an individual like Rena Merker, so Merker's death does not extinguish the EEOC's claims or make it inappropriate to continue. Filing 146 at 1. The EEOC points out that it is the named plaintiff, not Merker, and that its ability to pursue this litigation derives from 42 U.S.C. § 2000e-5(f)(1). Filing 146 at 1. In pursuing such litigation, the EEOC argues that it does not function simply as a vehicle for conducting litigation on behalf of private parties, it is not just a proxy for the employee, and it does not just stand in an employee's shoes, but instead is in command of the

process. Filing 146 at 1–2. The EEOC argues that this power to sue independent of any individual is part of Congress's intent to give the EEOC meaningful enforcement powers. Filing 146 at 2.

BNSF argues that neither Title VII nor the applicable caselaw squarely answers the first question posed by the Court for supplemental briefing. Filing 148 at 2. While BNSF concedes that Title VII gives the EEOC a separate cause of action from the aggrieved person's action, BNSF argues that it is not clear what effect, if any, the aggrieved person's death before or during the pendency of the action has on the EEOC's separate cause of action. Filing 148 at 3. BNSF argues that none of the caselaw it has found involved the situation presented here in which the Court dismissed with prejudice all claims by the EEOC for relief for persons other than the deceased individual. Filing 148 at 3. BNSF argues that this case presents the novel question of whether Congress intended for the EEOC's separate cause of action to continue after the death of the only natural person on whose behalf relief is or can be sought. Filing 148 at 5.[3] Consequently, BNSF immediately shifts its focus to whether this action can continue as currently scheduled or whether a stay is instead required and what remedies may ultimately be available if the EEOC's claim proceeds.[4]

---

[3] BNSF asserts further, "Whether the continued viability of EEOC's separate cause of action is dictated by the language of Title VII or governed by the federal common law on survival of private actions and, if the latter, whether that separate cause of action can properly be characterized as 'remedial' after the death of the only person on whose behalf EEOC can seeks remedies, are difficult questions for which BNSF did not find satisfying answers in the caselaw." Filing 148 at 5.

[4] More specifically, BNSF asserts that the case should be stayed until an executor or legal representative of Merker's estate is appointed to accept compensatory damages on Merker's behalf. Filing 148 at 5. BNSF also asserts that the only proper relief under the circumstances for "the unlawful employment practice charged in the complaint," as stated in 42 U.S.C. § 2000e-5(b)(1) is an award of compensatory damages (up to the statutory cap). Filing 148 at 6. Thus, BNSF's answer to the Court's first question blurred with answers to the second and fourth questions posed by the Court.

2.   *Discussion*

a.   The EEOC Can Continue to Prosecute this Case

The Court is satisfied that the EEOC has the authority to continue to prosecute this case—and BNSF does not argue otherwise. That said, in the circumstances of this case, the Court rejects BNSF's assertion that the Court should stay the case until a representative is appointed who can accept a compensatory damages award on Merker's behalf, but for reasons not voiced by either party.

First,

> As the Supreme Court has emphasized, "[g]iven the clear purpose of Title VII, the EEOC's jurisdiction over enforcement, and the remedies available, the EEOC need look no further than § 706 [42 U.S.C. § 2000e-5] for its authority to bring suit in its name for the purpose, among others, of securing relief for a group of aggrieved individuals." *Gen. Tel. Co. [of Nw. v. EEOC]*, 446 U.S. [318,] 324, 100 S.Ct. 1698 [(1980)]; *see also Occidental Life Ins. Co. [of Cal. v. EEOC]*, 432 U.S. [355,] 368, 97 S.Ct. 2447 [(1977)] ("The EEOC does not function simply as a vehicle for conducting litigation on behalf of private parties....").

*EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 681 (8th Cir. 2012). The EEOC's authority to sue is not limited to seeking relief for a group of aggrieved individuals. As the Eighth Circuit Court of Appeals has explained, "under Title VII, 'whenever the EEOC chooses from among the many charges filed each year to bring an enforcement action in a particular case, the agency may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief.'" *Id.* at 682 (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 296 (2002)). Indeed, in Waffle House, the Supreme Court rejected the Fourth Circuit's conclusion that the EEOC could not recover victim-specific relief because the aggrieved employee himself would be ineligible for such recovery because of a binding arbitration agreement. *Waffle House*, 534 U.S. at 291. The Supreme Court stated as follows:

10

> If it were true that the EEOC could prosecute its claim only with [the employee]'s consent, or if its prayer for relief could be dictated by [the employee], the court's analysis might be persuasive. But once a charge is filed, the exact opposite is true under the statute—the EEOC is in command of the process.... If ... the EEOC files suit on its own, the employee has no independent cause of action, although the employee may intervene in the EEOC's suit.... The statute clearly makes the EEOC the master of its own case and confers on the agency the authority to evaluate the strength of the public interest at stake.

*Waffle House*, 534 U.S. at 291; *CRST Van Expedited, Inc.*, 679 F.3d at 682.

In light of these precedents, it should be plain that the death of a victim—even the original or only "aggrieved person"—does not bar the EEOC from continuing to prosecute its own independent action. First, the EEOC has the authority under § 2000e-5 to bring suit in its name for the purpose, among others, of securing relief for a group of aggrieved individuals. *See CRST Van Expedited, Inc.*, 679 F.3d at 681. Second, the EEOC may seek to vindicate the public interest even when it pursues entirely victim-specific relief for which the individual is not eligible. *See id.* at 682. Third, the EEOC is in "command" of its lawsuit once it decides to prosecute a claim, with or without a victim's consent. *See id.* Because the EEOC's authority is not dependent upon the consent of an aggrieved person, the EEOC's lawsuit is entirely its own and may proceed even if the aggrieved individual cannot sue for whatever reason, including his or her death.

> b.  The Court Need Not Answer the Remaining Questions in the Circumstances of this Case

The Court finds that the other three questions it posed for supplemental briefing are not or at least are not very likely to be case dispositive in the circumstances presented here. More importantly, because the Court concludes that the EEOC can legally continue to prosecute this lawsuit, the remaining three question are moot in the circumstances presented here.

First, whether it is appropriate for the EEOC to continue to prosecute this lawsuit despite Merker's death—as posed in the Court's second question—is mooted by the Court's disposition

11

of BNSF's Motion for Summary Judgment in § II.B. below. BNSF's Motion for Summary Judgment would have been mooted if the EEOC decided not to continue to litigate this case, but the EEOC made clear that it intends to continue. *See* Filing 146 at 3–4. Where the EEOC has already been fully heard on the merits of BNSF's Motion for Summary Judgment, there is no reason for the Court not to proceed with its disposition of that Motion, and the Court's disposition of that Motion in § II.B. below means no relief of any kind will be granted.

Second, the Court's question about the evidentiary complications presented by Merker's death is also now moot. BNSF asserted in support of its Motion for Summary Judgment that even with Merker's deposition testimony, the EEOC could not point to evidence that would be admissible at trial sufficient to support all the alleged harassment of Merker, and the EEOC's ability to present admissible evidence is even more difficult now that Merker is not available to testify at trial to essential foundation and other evidentiary issues. What moots this question, however, is that the Court finds in § II.B. below that assuming without deciding that the EEOC will be able to present admissible evidence to support all its allegations of harassment of Merker, the harassment alleged is not actionable.

Finally, it is not clear what limitations are now placed on the ultimate relief that the EEOC may face after the death of the only remaining aggrieved person on whose behalf the EEOC is allowed to seek victim-specific relief in this case. However, the Court need not explore that question in this case. This is so where, for the reasons stated in § II.B. below, the Court finds that the EEOC has not generated genuine issues of material fact on actionable harassment of the only aggrieved person for whom the EEOC can now obtain victim-specific relief.[5]

---

[5] For this reason, the Court rejects BNSF's assertion that this case must at least be stayed pending appointment of a representative for Merker's estate who can receive any compensatory relief due her.

Under the circumstances, this case will proceed at least as far as the Court's disposition of BNSF's Motion for Summary Judgment despite Rena Merker's death.

## B. Summary Judgment

Because the Court concludes that this litigation can continue, and the EEOC declares its desire to continue it, the Court now turns to BNSF's Motion for Summary Judgment. The Court begins with summaries of the standards applicable to such a motion and the standards applicable to a sexually hostile environment claim. The Court will then consider BNSF's arguments for summary judgment that attempt to reduce the number of claims and narrow the evidence that can be considered in support of the claim or claims.

### 1. Applicable Standards

#### a. Standards for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides, "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Liberty Ins. Corp. v. HNTB Corp.*, 87 F.4th 886, 888 (8th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The court determines materiality [of facts] from the substantive law governing the claim"; thus, only "[d]isputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material." *Greater St. Louis Constr. Laborers Welfare Fund v. B.F.W. Contracting, LLC*, 76 F.4th 753, 757 (8th Cir. 2023) (quoting *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998)).

"The movant has the initial burden of establishing the basis for the motion by identifying 'those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Jones v. Wellpath, LLC*, 77 F.4th 658, 662 (8th Cir. 2023) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (cleaned up)). In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 662–63 (quoting *Torgerson*, 643 F.3d at 1042).

In deciding a motion for summary judgment, "it is not the role of the district court to weigh competing evidence or 'attempt to discern the truth of any factual issue.'" *Hall v. Higgins*, 77 F.4th 1171, 1182 (8th Cir. 2023) (quoting *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008)). Instead, "[s]ummary judgment is available when there is 'no genuine issue of material fact' and 'the evidence, viewed in a light most favorable to the nonmoving party, shows . . . the [moving party] is entitled to judgment as a matter of law.'" *Liberty Ins. Corp*., 87 F.4th at 888 (quoting *Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1134 (8th Cir. 2020)).

b.   Standards for Proof of a Sexually Hostile Environment

Because the "applicable substantive law" relevant to BNSF's Motion for Summary Judgment is the standards for a sexually hostile work environment claim, the Court turns to a summary of those standards. *See Greater St. Louis Constr. Laborers Welfare*, 76 F.4th at 757 (explaining, "The court determines materiality [of facts] from the substantive law governing the claim." (quoting *Liebe*, 157 F.3d at 578)). To survive summary judgment on a hostile work environment claim—whether the harassment is by a coworker or a supervisor—a plaintiff must establish a genuine issue of material fact with regard to each of the following elements: (1) that she belongs to a protected group; (2) that she suffered unwelcome harassment; (3) that there was

14

a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of her employment; and (5) that there is a basis for employer liability. *See Sellars v. CRST Expedited, Inc., 13 F.4th 681, 696 (8th Cir. 2021)* (coworker hostile environment claim); *see also EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 683 (8th Cir. 2012)* (explaining that claims of "[h]ostile work environments created by supervisors or coworkers have the [first four] elements in common"). However, the two kinds of claims differ in the way employer liability is established. *Id.* (after setting out the common elements, explaining the differences in proof of the element concerning employer liability). Thus, the Court turns to consideration of BNSF's argument that this is a "coworker harassment" case not a "supervisor harassment" case.

### 2.      Coworker Harassment Claims vs. Supervisor Harassment Claims

As mentioned above, BNSF seeks summary judgment "on all of Plaintiff's claims against BNSF." Filing 124 at 1. It appears from BNSF's briefing that by "all of Plaintiff's claims," BNSF means both a "supervisor harassment" claim and a "coworker harassment" claim to the extent that the Second Amended Complaint can be construed to assert both kinds of claims. This is so because one of BNSF's first arguments for summary judgment is that "[t]his is not a supervisor harassment case." Filing 125 at 11. The Court agrees with BNSF that whether harassment is by a coworker or a supervisor may be a key issue in a hostile environment case.

### a.     The Parties' Arguments

BNSF points to allegations that early in Merker's employment, then-road foreman of engines Alex Adam told Merker that he was stalking her on Facebook and commented on her eyelashes. Filing 125 at 11. BNSF contends that Adam was not Merker's "supervisor" for purposes of employer liability because a road foreman of engines is only a first-line supervisor. Filing 125

at 12. BNSF argues that such a first-line supervisor does not have authority to take tangible employment actions against an employee, such as hiring, firing, failing to promote, making a reassignment with significantly different responsibilities, or making decisions causing a significant change in benefits, as required to be a "supervisor" for employer liability purposes. Filing 125 at 12.

The EEOC first describes BNSF's focus on coworker harassment vs. supervisor harassment as "wasted effort," because the EEOC contends that it can demonstrate BNSF's liability based on the negligence standard applicable to employer liability for coworker harassment. Filing 133 at 2–3. However, the EEOC then argues that it has facts supporting BNSF's vicarious liability for conduct of its "supervisors"—plural—creating a hostile work environment. Filing 133 at 3. The EEOC argues that supervisor harassment is at issue because Alex Adam engaged in more harassing conduct than BNSF has acknowledged. Filing 133 at 11–12. The EEOC also argues that Alex Adam was a "supervisor" for Title VII purposes because he admitted that he was a supervisor and that he supervised Merker. Filing 133 at 19. The EEOC argues that Sam Roberts, who like Adam was a road foreman of engines, testified that he supervised Merker and that a person in his position could assess discipline. Filing 133 at 19. The EEOC also asserts that even if Adam did not have the power to take tangible employment actions himself, he had the power to recommend action that BNSF could take. Filing 133 at 19. The EEOC's final argument on this issue is the following:

> [T]he fact that first-line supervisors at BNSF are not empowered to take tangible employment actions reflects that BNSF is a unionized workforce. Def. Ex. 15, ¶¶ 4, 9. BNSF union employees are protected by a procedure for assessing discipline, demotions, terminations, and more per various collective bargaining agreements. That reality should not shield BNSF from liability for its supervisors' actions.

Filing 133 at 19–20.

In reply, BNSF points out that the only "supervisor" who allegedly harassed Merker was Alex Adam, but he was not a "supervisor" for purposes of employer liability under Title VII. Filing 139 at 8. BNSF also disputes the EEOC's argument that Sam Roberts's deposition testimony generates a genuine issue of material fact on whether a road foreman of engines had authority to take disciplinary action as based on an "overzealous reading" of that testimony. Filing 139 at 8. BNSF also offers a declaration of Roberts in an attempt to clarify his deposition testimony. Filing 141-1. Essentially, BNSF argues that Roberts was referring only to his ability to start a disciplinary process by sending a notice of investigation to an employee concerning a possible rules violation. Filing 139 at 8.

b. The Differing Liability Standards

As the Eighth Circuit Court of Appeals has explained, "Employers are not to be held strictly liable for a hostile work environment created by non-supervisory employee harassment." *Sellars, 13 F.4th at 698*. Instead, "[i]n cases of coworker-on-coworker harassment, the employer is liable only if the employer's own negligence caused the harassment or led to the continuation of the hostile work environment." *Id.* at 696 (internal citations omitted). The question of the employer's negligence turns on "whether [the employer] knew or should have known of the harassment and failed to take prompt and effective remedial action that [was] reasonably calculated to stop the harassment." *Id.* (quotation marks and citations omitted). More specifically, "[d]etermining the existence of an employer's negligence involves a two-step inquiry: (1) whether the employer had actual or constructive notice of the conduct, and (2) whether the employer took remedial action reasonably calculated to stop the harassment." *Id.* at 697 (quotation marks and citations omitted).

In contrast, "if the harassment was committed by an employee who supervised [the plaintiff], . . . her employer is vicariously liable for the harassment unless it can establish the

17

affirmative defense defined in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) [(hereinafter, the "*Ellerth–Faragher* Defense")]." *CRST Van Expedited, Inc.*, 679 F.3d at 683 (quoting *Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir. 2004)).[6] As the Eighth Circuit has explained,

> Under the *Ellerth–Faragher* Defense, [the employer] may avoid vicarious liability for a supervisory employee's harassment if it satisfies "'two necessary elements: (a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior[ ] and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Weger v. City of Ladue*, 500 F.3d 710, 718 (8th Cir. 2007) (quoting *Williams v. Mo. Dep't of Mental Health*, 407 F.3d 972, 976 (8th Cir. 2005)).

*CRST Van Expedited, Inc.*, 679 F.3d at 683.

Because the basis for employer liability differs between the two kinds of cases, the Court must determine whether the EEOC is asserting a coworker harassment claim, a supervisor harassment claim, or both. *Cf. id.* (stating that the "threshold matter" is whether certain employees were supervisors of the plaintiffs).

---

[6] The Supreme Court's decisions in *Ellerth* and *Faragher* establish another basis for employer liability for supervisor harassment in specific circumstances: "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee" if the employee suffered tangible employment action. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. Vicarious liability for supervisor harassment is subject to the *Ellerth-Faragher* defense only "[w]hen no tangible employment action is taken." *Id.*; *Faragher*, 524 U.S. at 807. The EEOC does not assert in response to BNSF's Motion for Summary Judgment that Merker was subject to any tangible employment action, so the *Ellerth-Faragher* defense is at issue here. *See generally* Filing 133.

    c.  The EEOC Fails to Generate a Genuine Issue of Fact on Supervisor Harassment of Merker

    i.   "Supervisor" for Title VII Employer Liability Purposes

The meaning of "supervisor" for purposes of employer liability under Title VII is determined by precedent, not by the colloquial or dictionary definition of the word. As the Supreme Court explained, "In general usage, the term 'supervisor' lacks a sufficiently specific meaning to be helpful for present purposes." *Vance v. Ball State Univ.*, 570 U.S. 421, 432 (2013). Likewise, the Supreme Court explained, "If we look beyond general usage to the meaning of the term in other legal contexts, we find much the same situation." *Id.* at 433. After concluding that "the term 'supervisor' has varying meanings both in colloquial usage and in the law," the Supreme Court also rejected treating "supervisor" as a statutory term:

> [P]etitioner is misguided in suggesting that we should approach the question presented here as if "supervisor" were a statutory term. "Supervisor" is not a term used by Congress in Title VII. Rather, the term was adopted by this Court in *Ellerth* and *Faragher* as a label for the class of employees whose misconduct may give rise to vicarious employer liability. Accordingly, the way to understand the meaning of the term "supervisor" for present purposes is to consider the interpretation that best fits within the highly structured framework that those cases adopted.

*Vance*, 570 U.S. at 436. The Supreme Court held that within that "highly structured framework," "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* at 424.

More specifically, the Supreme Court defined "tangible employment actions against the victim" as actions that "effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 431 (quoting *Ellerth*, 524 U.S. at 761); *CRST Van Expedited, Inc.*, 679 F.3d at 684 ("[T]o be considered a supervisor [for purposes of employer

liability under Title VII], the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties." (cited with approval in *Vance*, 570 U.S. at 448)).

The EEOC does not identify any purported "supervisor" other than Adam as one of Merker's harassers. *See generally* Filing 133.[7] The EEOC attempts to generate genuine issues of material fact that Adam was a "supervisor" for purposes of employer liability under Title VII in three ways. None of these attempts is successful.

> i.    Adam Lacked "Supervisory" Power

First, the EEOC argues that Adam and Roberts, both road foremen of engines, testified that they "supervised" Merker and that Roberts stated in deposition that he had the authority to assess discipline. Filing 133 at 19; *see also* Filing 134 at 6 (¶ 19) (response). BNSF admits that Adam and Roberts both stated in their depositions that they "supervised" Merker, but BNSF disputes whether either was a "supervisor" for purposes of employer liability under Title VII. Filing 140 at 20–21 (¶¶ 87–88). The EEOC asserts that Roberts also stated in his deposition that he could assess discipline. Filing 133 at 19. BNSF argues that, properly clarified, that statement does not establish that a road foreman of engines was a "supervisor" for purposes of employer liability under Title VII. Filing 139 at 8.

In his deposition, Roberts testified as follows:

---

[7] The EEOC does argue that unidentified "supervisors" participated in unidentified harassment. *See* Filing 133 at 12. The EEOC also argues that Merker reported harassment to various named "supervisors." *See, e.g.*, Filing 133 at 5 (arguing that Merker reported the incident where a engineer yelled at her after she "nodded off" "to her supervisor Alex Adam"), 8 (arguing that Merker "complained to supervisors and Human Resources about harassment"), 12 (arguing that Merker reported sexual harassment to "various supervisors" throughout her employment including seven identified by name).

Q.      As road foreman of engines, were you empowered to fire employees?

A.      No.

Q.      As road foreman of engines, could you issue discipline to your employees that you supervised?

A.      Yes.

Filing 127-13 at 21:3–8.

However, in a declaration offered by BNSF with its Reply, Roberts declares in pertinent part,

4.      Specifically, in my deposition the EEOC's attorney asked me if as a (road foreman of engines (RFE)) I could "issue discipline to" employees that I supervised. I responded, "Yes." The attorney did not ask me any other questions about the authority to issue discipline, did not ask me how I understood the phrase "issue discipline," and did not provide any information on the questioner's intended meaning.

5.      When I answered the question by stating "Yes," I was answering it based on my understanding of the question and that phrase. Specifically, I was referring to the fact that as a RFE, which is a first line supervisor position, I have the authority to begin the discipline process by sending, or having sent, i.e., issuing, a notice of investigation to the scheduled employee. Generally, the discipline process begins with a notice of investigation, followed by an investigation hearing to gather facts about the potential violation, followed by management review (and review by others if the employee stands for dismissal), and a decision. I have the authority to begin that process and often would because as an RFE I oftentimes would be the first point of contact within management as to a potential rules violation. Sometimes I will have personally observed the conduct and so will have first-hand knowledge about the events. But I did not (and do not) have the authority to decide whether an employee will be disciplined or what type of disciplinary action will be taken. That is not what I was saying when I answered "Yes" to the question described above.

6.      As a first line supervisor I also did not have authority to make hiring, firing, promotion, or demotion decisions, or otherwise to make decisions that would significantly alter an employee's terms or conditions of employment.

21

Filing 141-1 at 1–2 (¶¶ 4–6). BNSF asserts that, in light of this clarification, there is no genuine issue of material fact that Roberts (or Adam) did not have the authority to make a decision about whether an employee will be disciplined. Filing 139 at 8.

This post-deposition declaration invites the question of whether it is a "sham affidavit." "Typically, sham affidavits appear as a plaintiff's stratagem to defeat summary judgment." *Button v. Dakota, Minnesota & E. R.R. Corp.*, 963 F.3d 824, 830 (8th Cir. 2020). As the Eighth Circuit Court of Appeals has explained, "An affidavit is a sham affidavit if it contradicts prior testimony or is a sudden and unexplained revision of testimony that creates an issue of fact where none existed before." *Edwards v. Skylift, Inc.*, 39 F.4th 1025, 1030 (8th Cir. 2022) (quoting *Button*, 963 F.3d at 830). Such a "sham affidavit" should be "disregarded." *Garang v. City of Ames*, 2 F.4th 1115, 1122 (8th Cir. 2021). "However, if the affidavit merely explains portions of a prior deposition that may have been unclear, it is not a sham affidavit." *Button*, 963 F.3d at 830 (citing *City of St. Joseph v. Sw. Bell Tel*., 439 F.3d 468, 476 (8th Cir. 2006)); *Edwards*, 39 F.4th at 1030 (quoting this statement from *Button*, 963 F.3d at 830). The Eighth Circuit has explained that in the atypical situation in which the party moving for summary judgment has offered an affidavit as a basis to grant summary judgment, essentially the same standards apply to determine whether an affidavit is a sham. *See id.*

This case involves that atypical situation, because BNSF has offered the later declaration to attempt to eliminate a genuine issue of material fact. Applying the sham affidavit standards, the Court concludes that Roberts's declaration does not contradict his deposition testimony that he could issue discipline to employees that he supervised, but merely explains a portion of his deposition on that point that may have been unclear. *Id.* at 830–31. Specifically, it explains that, because there was no clarification of what "supervisor" or "issue discipline" meant, Roberts

22

answered the questions based on his understanding that he was "issuing discipline" when he initiated the disciplinary process by issuing a notice of investigation. Filing 141-1 at 1–2 (¶¶ 4–6). That is an entirely reasonable understanding of "issuing discipline" in a colloquial sense. However, the meaning of "supervisor" for purposes of Title VII employer liability is not a "colloquial" one, *see Vance*, 570 U.S. at 436; rather, it is one defined by precedent to mean a person who can "take tangible employment actions against the victim." *Id.* at 431. "Issuing discipline" as Roberts understood it does not meet the standard of "tangible employment action" by a "supervisor." *Id.* (citing *Ellerth*, 524 U.S. at 761). In short, the EEOC has pointed to nothing generating a genuine issue of material fact that any harasser of Merker was a "supervisor" within the meaning of the term for purposes of employer liability under Title VII set out in *Vance* and its progeny. *See Jones*, 77 F.4th at 662–63 (explaining that in resisting summary judgment, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" (quoting *Torgerson*, 643 F.3d at 1042)).

Indeed, the EEOC seems to be attempting to revive here "the more open-ended approach advocated by the EEOC's [1999] Enforcement Guidance" and in common parlance that the Supreme Court expressly rejected in *Vance*. That approach "tie[d] supervisor status to the ability to exercise significant direction over another's daily work." *See id.* at 431 (citing *Mack v. Otis Elevator Co.*, 326 F.3d 116, 126–127 (2d Cir. 2003); *Whitten v. Fred's, Inc.*, 601 F.3d 231, 245–247 (4th Cir. 2010); EEOC, Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors (1999), 1999 WL 33305874, at *3 (hereinafter EEOC 1999 Guidance)). As the Supreme Court explained, "We reject the nebulous definition of a 'supervisor' advocated in the EEOC [1999] Guidance and substantially adopted by several courts of appeals,"

23

adding, "Petitioner's reliance on colloquial uses of the term 'supervisor' is misplaced, and her contention that our cases require the EEOC's abstract definition is simply wrong." *Id.* at 431–32.

The EEOC's first argument does not generate a genuine issue of material fact that Merker was subjected to supervisor harassment. *See Jones*, 77 F.4th at 662–63.

> ii.   The Power to Recommend Action BNSF Could Take Did
> Not Make Adam a "Supervisor"

The EEOC's second attempt to generate a genuine issue of material fact that Adam was a "supervisor" is based on its contention that even if Adam could not take tangible employment action himself, he did have the power to recommend action that BNSF could take. Filing 133 at 19. In support, the EEOC asserts that in *Vance*, the Supreme Court stated that an employee may qualify as a "supervisor" if the employee can make recommendations on which an employer relies. Filing 133 at 19 (citing *Vance*, 570 U.S. at 437 n.8). That assertion is based on an understanding of *Vance* that is at best incomplete.

The footnote in *Vance* on which the EEOC relies states the following in its entirety:

> The dissent suggests that it is unclear whether Terry would qualify as a supervisor under the test we adopt because his hiring decisions were subject to approval by higher management. *Post*, at 2458, n. 1 (opinion of GINSBURG, J.). *See also Faragher*, 524 U.S., at 781, 118 S.Ct. 2275. But we have assumed that tangible employment actions can be subject to such approval. *See Ellerth*, 524 U.S., at 762, 118 S.Ct. 2257. In any event, the record indicates that Terry possessed the power to make employment decisions having direct economic consequences for his victims. *See* Brief for Petitioner in *Faragher v. Boca Raton*, O.T. 1997, No. 97–282, p. 9 ("No one, during the twenty years that Terry was Marine Safety Chief, was hired without his recommendation. [He] initiated firing and suspending personnel. [His] evaluations of the lifeguards translated into salary increases. [He] made recommendations regarding promotions ..." (citing record)).

*Vance*, 570 U.S. at 437 n.8. To the extent this statement might suggest that mere ability to "recommend" tangible employment actions that may be subject to review by higher-ups is enough

to make one a "supervisor" for purposes of employer liability under Title VII, such a suggestion is dispelled by other precedent.

As the Eighth Circuit Court of Appeals recognized,

Although the Supreme Court declined, in *Ellerth* and *Faragher*, to "answer the question, 'who is a supervisor?,'" *Joens [v. John Morrell & Co.]*, 354 F.3d [938,] 940 [(8th Cir. 2004)], it did observe that a "tangible employment decision ... may be subject to review by higher level supervisors," *Ellerth*, 524 U.S. at 762, 118 S.Ct. 2257. Indeed, the EEOC relies on this very observation in *Ellerth* to support its own assertion that "[i]t is immaterial that CRST may, on occasion, not follow a trainer's recommendation." However, the EEOC's argument in this regard fails for two reasons. First, aside from its bare assertion, the EEOC offers no evidence that CRST simply "rubber stamped" its Lead Drivers' recommendations. *See Staub v. Proctor Hosp.*, ── U.S. ──, 131 S.Ct. 1186, 1194, 179 L.Ed.2d 144 (2011) (holding that if a non-decisionmaker performs an act motivated by a discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action, then the employer has "cat's paw" liability). Second, we have concluded, under almost identical circumstances, that a coworker's authority to make mere *recommendations* or evaluations to a superior about tangible employment decisions pertaining to a fellow employee does not constructively promote that coworker to a supervisor for purposes of vicarious Title VII liability. *See, e.g., Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 851 (8th Cir. 2005)....

*CRST Van Expedited, Inc.*, 679 F.3d at 684–85 (emphasis in the original). Although the EEOC contends that a road foreman of engines could "issue" or "recommend" discipline, Roberts's declaration quoted above—and confirmed by declarations by Jeff Stevens, Filing 127-15 at 2–3 (¶ 10), and Alex Adam, Filing 127-16 at 1–2 (¶¶ 3–4)—demonstrates beyond genuine dispute that such issuance or recommendation of discipline by a first-line supervisor was not simply "rubber stamped" by BNSF. It was instead a "mere recommendation" investigated in further proceedings and resolved by other actual decisionmakers, i.e., the employees who would rightfully be considered Merker's "supervisors." *CRST Van Expedited, Inc.*, 679 F.3d at 684-85.

Thus, the EEOC's second attempt to generate a genuine issue of material fact on "supervisor" harassment fails to meet its burden. *See Jones*, 77 F.4th at 662–63.

### iii. There Is No "Union Shop" Exception for Employer Liability for Supervisor Harassment

The EEOC's third argument is that the first-line supervisors' lack of power to take tangible employment actions simply reflects the fact that BNSF is a unionized workforce, and that fact should not shield BNSF from liability for its supervisors' actions. Filing 133 at 19–20. The EEOC cites no authority for a purported special rule or exception for employer liability for supervisor harassment when a supervisor in a "union shop" lacks the power to take tangible employment actions. Certainly, it is no argument for a less stringent standard for employer liability for supervisor harassment that "BNSF union employees are protected by a procedure for assessing discipline, demotions, terminations, and more per various collective bargaining agreements," as the EEOC seems to suggest. Filing 133 at 20. Rather, the standards for protection of union employees are obviously designed at least in part to ensure that tangible employment actions are not discriminatory. The Supreme Court expressly rejected the application in any kind of case of the EEOC's definition of "supervisor" for employer liability for harassment that "tie[d] supervisor status to the ability to exercise significant direction over another's daily work," as set out in the EEOC's 1999 Guidance. *Vance*, 570 U.S. at 431. This second attempt in this case by the EEOC to revive such a definition even in special circumstances involving "union shop" cases is also unavailing.

Thus, the EEOC's third attempt to generate a genuine issue of material fact on "supervisor" harassment fails to meet its burden. *See Jones*, 77 F.4th at 662–63.

### d.   Summary

For the reasons set out above in this Section II.B.2., BNSF is entitled to summary judgment on any supervisor harassment claim. Those reasons make it unnecessary to consider whether any harassment attributable to Alex Adam, the only alleged supervisor harasser identified by the EEOC, was sufficiently severe or pervasive to be actionable standing alone. It does not make conduct attributable to Adam irrelevant, however, if that conduct contributed to an actionable sexually hostile work environment perpetrated by coworkers. The Court will only consider further whether the EEOC has an actionable claim of coworker harassment.

### 3.   *Time Limitation on the Actionable Harassment*

Next, the Court finds it must address BNSF's contention to narrow the scope of any actionable harassment based on BNSF's belief that the EEOC is only seeking relief in this case for harassment after March 23, 2017. *See, e.g.*, Filing 125 at 11, 20, 23. The EEOC counters that the Court and the jury can consider all the harassment that Merker allegedly suffered while employed at BNSF. Filing 133 at 7.

### a.   The Parties' Arguments

BNSF asserts that the EEOC is only seeking relief in this case for harassment of Merker that occurred after March 23, 2017, citing BNSF's own statement of facts. Filing 125 at 11 (citing Filing 126 at 2 (¶ 8)). Specifically, in the cited factual allegation, BNSF alleges, "The Second Amended Complaint includes only a claim of sexual harassment and alleges the claims on behalf of Merker and other women arising from alleged conduct at the Alliance railyard from March 23, 2017 to the present." Filing 126 at 2 (¶ 8). Thus, BNSF argues that incidents before that date are outside the scope of the lawsuit. Filing 125 at 11; *see also* Filing 126 at 10 (¶ 45.d.) (alleging that

there is no evidence that an alleged event "occurred during the March 23, 2017, forward timeframe as to which [the] EEOC states it is seeking relief"), 11–12 (¶ 45.e.) (same), 11 (¶ 45.h.) (same).

The EEOC disputes that the applicable time frame is limited to the period after March 23, 2017, as to each of the incidents where BNSF made that allegation. The EEOC argues that the harassment Merker suffered while employed at BNSF was a single, ongoing unlawful employment practice—*i.e.*, a "continuing violation." Filing 133 at 7. The EEOC argues that if an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for purposes of determining liability. Filing 133 at 7. The EEOC argues that Merker's charge alleged a contributing incident involving engineer Mark Jones on July 18, 2017, within the filing period, which makes actionable the entire period of her employment both before and after she filed her charge. Filing 133 at 7–8.

In reply, BNSF argues that it focused on March 23, 2017, as the start of the pertinent time frame for harassment because the EEOC's Second Amended Complaint inserted that date after BNSF's earlier Motion to Dismiss raised limitations arguments. Filing 139 at 3. Consequently, BNSF asserts, it "understood" the EEOC to be limiting the time period for which it sought relief to conduct from that date forward. Filing 139 at 3. BNSF passes off allegations about conduct prior to March 23, 2017, as simply attempts to use time-barred conduct as background for a timely claim. Filing 139 at 3. BNSF argues that only now is the EEOC "seizing on ambiguity in its statements" to argue for relief for earlier conduct, but a fair reading of the Second Amended Complaint indicates that the EEOC limited the time frame for its claims. Filing 139 at 4. In the alternative, BNSF argues that the evidence does not support a continuing violation in this case. Filing 139 at 4. BNSF argues that the acts on either side of March 23, 2017, are not similar in nature, frequency, and severity, not of the same type, and were perpetrated by different actors, so

that they cannot be treated as the same unlawful employment practice. Filing 139 at 4. For example, BNSF argues that the incident involving Mark Jones in July 2017 cannot be used to reach back further because it is not sufficiently similar to any other events on which the EEOC relies. Filing 139 at 5. BNSF argues that it is not enough to establish a continuing violation that all the events were based on sex, even assuming that all the incidents that Merker described were actually based on sex. Filing 139 at 6.

> b.  The Second Amended Complaint Does Not Expressly Limit the Harassment Claim to Conduct After March 23, 2017

The Court does not agree with BNSF that the EEOC's Second Amended Complaint expressly limited the harassment claim concerning Merker to conduct after March 23, 2017, and the Court finds that the Second Amended Complaint cannot reasonably be read to do so. As a starting point, the Second Amended Complaint alleges, "On November 24, 2020, the Commission issued to Defendant a Letter of Determination finding reasonable cause to believe that Defendant violated Title VII by subjecting Merker and other female employees at its Alliance, Nebraska location to harassment and sexual harassment, beginning as early as November 2011." Filing 41 at 2–3 (¶ 10). BNSF admitted the allegations of this paragraph, while denying the truth of any allegation of improper conduct. Filing 77 at 2 (¶ 11). Thus, BNSF acknowledged that Merker's administrative charge asserted harassment beginning as early as November 2011. While the subsequent civil action can be narrower than the administrative charge, it cannot be broader. *Slayden v. Ctr. for Behav. Med.*, 53 F.4th 464, 469 (8th Cir. 2022). The Second Amended Complaint does not violate the scope of the administrative charge.

The Second Amended Complaint alleges as "Background" that "[f]rom October 2011 through the present, Defendant has engaged in unlawful employment practices, in violation of

Section 703 of Title VII, 42 U.S.C. §§ 2000e-2, by creating a hostile work environment based on sex at its Alliance, Nebraska railyard." Filing 41 at 3 (¶ 16). Next, for present purposes, the Second Amended Complaint alleges,

> 22.    In this suit, the Commission seeks relief for women who worked in TY&E and Yard Master positions from March 23, 2017 to the present who were subjected to a severe or pervasive unwelcome, offensive hostile work environment because of their sex, created by the actions of men who worked out of the Alliance railyard in TY&E and Yard Master positions, and in supervisory and management positions related to and above the TY&E and Yard Master jobs. These women include Rena Merker, four exemplars described in this complaint, and others. The size and scope of this group is cabined by the parameters set forth in paragraph 21 above.

Filing 41 at 4–5 (¶ 22). While this paragraph does refer to women who worked in Train, Yard, & Engine (TY&E) positions "from March 23, 2017 to the present," that language limits membership in the group, not the time frame of the harassing conduct that they allegedly suffered. *Id.* Nothing in paragraph 21 of the Second Amended Complaint, to which paragraph 22 refers, limits the time frame of harassment that the "group" of women allegedly suffered either, although it does attempt to limit the size of the group. *See* Filing 41 at 4 (¶ 21). The Second Amended Complaint then alleges, "Some acts of harassment that contributed to a sexually hostile work environment for Merker, the exemplars, and others occurred prior to March 23, 2017 and, for some women, as far back as October 2011." Filing 41 at 5 (¶ 23); *see also* Filing 41 at 13 (¶ 72) ("After March 23, 2017, Merker, the exemplars, and other female employees in TY&E and Yard Master positions in Alliance experienced additional harassing, offensive, demeaning, and derisive graffiti, treatment, and comments because of their sex almost daily from October 2011 to the present."). If there was previously any doubt, this allegation makes clear that the Second Amended Complaint seeks relief for harassment both before and after March 23, 2017.

30

That clarity is not undermined by later allegations that each of the exemplars worked at BNSF in TY&E positions "after March 23, 2017," or "since before March 23, 2017." *See* Filing 41 at 8 (¶ 42), 10 (¶ 51), 11 (¶ 58), 12 (¶ 64). Such allegations demonstrate membership in the "group," but they do not and cannot reasonably be read to limit the time frame of the alleged harassment for which the EEOC sought relief. Indeed, for each exemplar, who allegedly worked for BNSF in TY&E positions before March 23, 2017, the Second Amended Complaint alleges incidents from the beginning of her employment. Filing 41 at 10 (¶ 52), 11 (¶ 59, ¶¶ 61–62), 12 (¶¶ 65–66). Likewise, the Second Amended Complaint alleges, "Merker was subject to and observed sexual harassment from the outset of her employment" which occurred "on October 31, 2011." Filing 41 at 5 (¶¶ 24–25).

Similarly, the EEOC's intention to assert claims based on harassment prior to March 23, 2017, is not undermined by the EEOC's contention—in response to BNSF's prior Motion to Dismiss the claim on behalf of the "group" of aggrieved women—that the Second Amended Complaint narrowed the time frame to the period from March 23, 2017, to the present. Filing 55 at 4. BNSF asserts that the Court understood the EEOC to be limiting its claim to harassment after March 23, 2017, because the Court summarized the EEOC's argument as including a contention that the EEOC "has narrowed the time frame to the period from March 23, 2017, to the present." Filing 139 at 4 (quoting Filing 74 at 29, in turn citing Filing 55 at 4). Again, the argument the Court summarized concerned limitation on the size of the group to women employed after March 23, 2017, to the present, not a limitation on the time frame of the harassment for which members of the group could recover. *See* Filing 74 at 29. Further, the EEOC explained that "[e]vidence of harassing conduct pre-dating March 23, 2017 provides background which can be used as evidence in this case." Filing 55 at 4 n.2. The EEOC then added, "[T]he EEOC only seeks relief in this suit

31

for aggrieved individuals who suffered at least one instance of sexual harassment after March 23, 2017." Filing 55 at n.2. These arguments were in the context of attempting to demonstrate that the EEOC adequately pleaded the size of the group of aggrieved individuals, *see* Filing 55 at 3–5, while the reference to at least one instance of harassment after March 23, 2017, is relevant to whether or not the EEOC has alleged a "continuing violation" as explained in detail below.

Finally, BNSF argues that the Court read the Complaint the same way that BNSF does, because the Court referred to the EEOC's "limitation of the claim to harassment after March 23, 2017," and the EEOC did not object. Filing 139 at 4 (quoting Filing 74 at 28). This statement by the Court was in the context of determination of whether the EEOC had made allegations sufficient to draw a reasonable inference that discrimination happened "to a group" of "persons aggrieved." *See* Filing 74 at 22–29. More specifically still, it was made in the context of a determination of whether the EEOC had adequately pleaded harassment of group members within the same time frame to identify a coherent group. Filing 74 at 28. The Court's complete statement was that incidents of harassment of group members "are also scattered over a period from 2011 to 2020 (despite limitation of the claim to harassment after March 23, 2017) with so little continuity and involving so many different kinds of harassment as to undercut the plausibility of allegations of a continuing violation." Filing 74 at 28. The parenthetical comment is technically incorrect, for the reasons set out above; nevertheless, it is clear from the context in which it appears that it should have been "despite limitation of the claim to harassment *of women employed* after March 23, 2017."

As discussed above, BNSF is wrong that the Second Amended Complaint did not at least attempt to plead a claim involving harassment prior to March 23, 2017. However, even though the Court concludes that the EEOC attempted to plead a claim based on harassment prior to that date,

BNSF is ultimately correct that, "as a matter of law," Fed. R. Civ. P. 56(a), the EEOC's claim is limited to harassment of Merker on or after March 23, 2017, for the reasons stated in the next subsection.

####  c.   The EEOC Has Not Demonstrated a Factual Dispute on a "Continuing Violation"

Simply attempting to plead a claim based on harassment prior to the limitations cutoff is not enough. The Court must also consider BNSF's argument that the record evidence does not support a "continuing violation" in this case that would allow relief for harassment before the limitations cutoff. Filing 139 at 4.

As the Eighth Circuit Court of Appeals recently reiterated, "Because a hostile work environment consists of a series of separate acts, [a plaintiff] only needed to file his [administrative] charge within 300 days of at least one act that is part of the hostile work environment." *Slayden v. Ctr. for Behav. Med.*, 53 F.4th 464, 467 (8th Cir. 2022) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117–18 (2002)). "If that requirement is met, a party may then recover for all illegal acts that made up the hostile work environment." *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 526 (8th Cir. 2019) (quoting *Madison v. IBP, In*c., 330 F.3d 1051, 1061 (8th Cir. 2003)). "The continuing violation rule applies to punitive, as well as compensatory, damages." *Id.* However, as this Court previously noted in this case in its ruling on BNSF's Motion to Dismiss, there must be some relationship among the alleged incidents of harassment before and after the limitations cutoff to find a "continuing violation." Filing 74 at 28 (citing *Jenkins v. Mabus*, 646 F.3d 1023, 1027 (8th Cir. 2011)).

Specifically, in *Jenkins*, the Eighth Circuit Court of Appeals explained,

> Contradicting her EEO complaint, pleadings, and admissions, Jenkins argues that the post-December 4 conduct was continuing sexual harassment

because she is female, although the conduct was not sexual in nature, not as frequent, and not as severe. "A charge alleging a hostile work environment claim ... will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *see also Burkett v. Glickman*, 327 F.3d 658, 660 (8th Cir. 2003) (principles in *Morgan* as to time limits on "employment practice" of private employer apply to "matter" of federal employer). This court considers "whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Rowe v. Hussmann Corp.*, 381 F.3d 775, 779 (8th Cir. 2004), quoting *Morgan*, 536 U.S. at 120, 122 S.Ct. 2061. "[A]cts before and after the limitations period [that are] *so similar in nature, frequency, and severity* ... must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to th[e] action." *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 951 (8th Cir. 2011), quoting *Rowe*, 381 F.3d at 781.

The district court correctly concluded that the post-December 4 conduct is not similar in nature, frequency, and severity to the pre-December 4 conduct. In *Wilkie*, this court rejected a continuing-violation theory where the original harassment was the defendant's sexual advances, while the later conduct was markedly different, consisting of slights, insults, and affronts. *See Wilkie*, 638 F.3d at 952. In this case also, the Navy's post-December 4 conduct consisted of insults, slights, and affronts that were markedly different from the original sexual advances. The reason for the marked difference is clear: as the district court specifically found, the Commanding Officer "took immediate action to resolve the situation on December 4, 2003," and that the "sexually harassing conduct ended on December 4, 2003." *Cf. Jensen v. Henderson*, 315 F.3d 854, 862 (8th Cir. 2002) (as the employer allowed harassment to continue into the 45–day period, employee timely contacted EEO counselor). Because the post-December 4 conduct was not so similar to the earlier conduct as to be a continuing violation, Jenkins did not contact an EEO counselor within 45 days after the sexual harassment.

*Jenkins*, 646 F.3d at 1026–27 (emphasis in the original).

The Court begins with the conduct toward Merker that allegedly occurred within the limitations period then considers whether that conduct is similar in nature to the earlier conduct. *Id.* The EEOC argues that in Merker's administrative charge, she "specifically referenced an incident that occurred on July 18, 2017 [involving Mark Jones]—less than three hundred days

34

before the charge." Filing 133 at 7 (citing Filing 140 at 38 (¶ 152); Filing 135-11 at 3). The parties agree that on July 18, 2017, a male engineer named Mark Jones screamed angrily at Merker and used an obscenity when she asked why the train was going so slowly when she woke up after having "nodded off." Filing 134 at 8 (¶¶ 26–27); Filing 140 at 10–11 (¶ 61.bb.–gg.). The problem with using this incident as the qualifying one within the limitations period is that as a matter of law it is unlike any other incident of alleged harassment before or after March 23, 2017. *See Jenkins*, 646 F.3d at 1027 (requiring that incidents before and in the limitations period are "similar in nature"). BNSF is correct that the fact that Merker was a female is not enough to establish the required connection among the incidents alleged. *Id*. at 1026. Even assuming without deciding that the incident involving Mark Jones was because of Merker's sex, none of the earlier (or later) incidents involved a man shouting angrily at Merker and engaging in what Merker perceived as physical intimidation. *See* Filing 140 at 1–15 (¶ 61.a.–ss.). Thus, as a matter of law, the July 18, 2017, incident does not open the door to liability for a "continuing violation" because instead of being "similar in nature" to earlier incidents, it is "markedly different" from them. *Jenkins*, 646 F.3d at 1027.

The EEOC's only other argument in support of its "continuing violation" theory in response to BNSF's Motion for Summary Judgment is that Merker alleged in her charge that she was subjected to a hostile work environment throughout her employment and that her allegations related to a "continuing action." Filing 133 at 7; *see also* Filing 140 at 38 (¶¶ 150–151). The EEOC has pointed to evidence providing rather more specific dates for alleged incidents of harassment from 2011 through 2020 than it did in the Second Amended Complaint. Nevertheless, the EEOC has done nothing more than "show that there is some metaphysical doubt" as to whether similar incidents occurred before and after the limitations date, so that the EEOC has fallen well short of

35

"coming forward with 'specific facts showing that there is a genuine issue for trial.'" *Jones*, 77 F.4th at 662–63 (quoting *Torgerson*, 643 F.3d at 1042).

Specifically, none of the incidents to which the EEOC now points are explicitly dated to 2014 or 2015. *See generally* Filing 140. There is one incident that was alleged broadly to have occurred "sometime before 2016" when a male coworker allegedly showed Merker a picture of a topless female BNSF employee, Filing 140 at 8 (¶ 61.x.), but that dating is vague. There was another incident in which Merker was allegedly shown photos of a naked or topless woman that allegedly occurred "in 2016." Filing 140 at 9 (¶ 61.aa.), 23 (¶ 98) (same incident). What is significant about these two incidents involving photos of topless or naked women is that there are no allegations of a similar incident within the limitations period. Merker alleged an incident on or about August 12, 2018, in which an employee allegedly put pictures of a naked woman with a caption stating that it was another employee's wife on the windshields of vehicles at the Edgemont, South Dakota, depot. Filing 140 at 13 (¶ 61.ll.). However, this incident is not "similar in nature" to the earlier two incidents in which Merker was shown the photos of a naked or topless woman because in this later incident Merker only received a text message about an occurrence at a different location. Filing 140 at 13 (¶ 61.ll.) (response). Likewise, there was an incident in July 2019 in which a framed photo of a man fishing that showed his penis dangling out of his shorts with the caption "Retirement." *See* Filing 140 at 13 (¶ 61.nn.); Filing 132-1 at 11 (sealed) (photo). However, that photo is not "similar in nature" to a photo of a nude or semi-nude woman. Thus, from 2014 through 2016 there were no specifically dated incidents "similar in nature" to any incidents that allegedly occurred in 2017 or later. *See Jenkins*, 646 F.3d at 1027.

It is true that even a lengthy hiatus in harassment does not necessarily preclude a jury from finding a "continuing violation." *Rowe*, 381 F.3d at 780 (citing *Nat'l R.R. Passenger Corp.*, 536

U.S. at 118). Nevertheless, this "hole" in the record of harassing incidents means that the EEOC must show that a reasonable jury could still infer a connection between pre-2014 incidents and post-2016 incidents, based on such things as whether the same harasser committed the same harassing acts before and after the limitations deadline. *Id.* at 781.

Candidates for incidents to fill the gap are kinds of incidents that allegedly occurred "throughout" Merker's employment. Those incidents consist of references to Merker's appearance, Filing 140 at 4 (¶ 61.j.), and incidents from 2011 "to at least 2019" involving "crude sexual images, including penises and vaginas," throughout the workplace, including inside restrooms and locomotives, Filing 140 at 21 (¶ 91); Filing 140 at 14 (¶ 61.44.). Few of those incidents are supported with evidence of the specific dates that Merker experienced such comments or saw such images, so there is no reasonable basis to find that they actually occurred both before and after the limitations cutoff. Incidents involving comments on Merker's appearance prior to the limitations period allegedly occurred in 2011 to 2013. *See* Filing 140 at 2 (¶ 61.b.), 2 (¶ 61.d.), 3 (¶ 61.f.–g.), 4 (¶ 61.k.). The EEOC also alleges undated incidents, which do nothing to establish "continuity" of this kind of harassment. *See* Filing 140 at 4 (¶ 61.i.–j.), 6 (¶ 61.p.), 7 (¶ 61.r.), 8 (¶ 61.w.), 14 (¶ 61.qq.). Finally, the EEOC alleges at least one such incident within the limitations period. *See* Filing 140 at 12 (¶ 61.kk.). Thus, there is a gap amounting to years between the pre-limitations incidents of inappropriate comments on Merker's appearance and the post-limitation incident for which dates are specified. More importantly, these incidents did not involve the same alleged harassers. *See Rowe*, 381 F.3d at 781. It is not enough that all the harassers were male any more than it is enough that the victim in each incident was female. *See Jenkins*, 646 F.3d at 1026–27 (explaining that it is not enough to assert that all the incidents involved females). Hence, these incidents provide no more than "a scintilla of evidence" to support the EEOC's allegations of

harassment "throughout" Merker's employment, which is insufficient to create a genuine factual dispute. *Johnson v. Midwest Div.-RBH, LLC*, 88 F.4th 731, 736 (8th Cir. 2023) (quoting *Anderson*, 477 U.S. at 252).

Turning to graffiti, the EEOC alleges that "prior to July 18, 2017," Merker reported graffiti of a penis above an eye wash station, Filing 140 at 24 (¶ 99), but Merker stated in deposition that she had first seen that graffiti in 2011, and she admitted that she did not report it until 2017, Filing 127-3 at 59:12–21. Merker reported seeing other graffiti in 2017 and 2018. *See* Filing 140 at 13 (¶ 61.mm.); Filing 140 at 26 (¶ 108); Filing 140 at 27 (¶ 111); Filing 140 at 27 (¶ 112). However, a single prior incident of seeing graffiti six or seven years earlier leaves a huge gap between pre-limitations graffiti and post-limitations graffiti. That gap is not closed by Merker's delay in reporting the single prior incident. That single incident years earlier is not enough to make graffiti the basis for a "continuing violation" into the limitations period, nor is there any indication that the graffiti was done by the same harassers. *See Rowe*, 381 F.3d at 781. Allegations that management-level employees were aware of graffiti in the workplace and on trains at unspecified times likewise do not fill in this gap, even if they might demonstrate that BNSF knew or should have known of the graffiti. *See* Filing 140 at 22–23 (¶¶ 92–97). Again, these incidents lack any hint that the same harassers were involved so they provide no more than "a scintilla of evidence" to support the EEOC's allegations of harassment "throughout" Merker's employment, which is insufficient to create a genuine factual dispute. *Johnson*, 88 F.4th at 736 (quoting *Anderson*, 477 U.S. at 252).

Thus, BNSF is entitled to summary judgment on the EEOC's "continuing violation" theory of coworker sexual harassment, meaning that BNSF is also entitled to summary judgment on any claim for damages for harassment that occurred prior to March 23, 2017. *See Bryant*, 919 F.3d at

38

526 (explaining that if a "continuing violation" is proved, the plaintiff may obtain relief, including both compensatory and punitive damages, for the entire period).[8]

### 4. Incidents of Harassment of which Merker Was Not Aware

BNSF attempts to narrow the relevant evidence still further based on an argument that incidents of harassment of which Merker was unaware are irrelevant. Filing 133 at 9. The Court will consider that issue next.

#### a. The Parties' Arguments

BNSF argues that harassment claims turn on conduct experienced by the allegedly harassed employee or conduct toward others that she was aware of during the time she was allegedly subject to a hostile environment, not harassment of others of which the employee was not aware. Filing 125 at 9. BNSF explains that evidence of which an employee is unaware cannot have any bearing on whether that employee considered her working environment abusive. Filing 125 at 9. The EEOC disputes this contention. Filing 133 at 15. While the EEOC appears to acknowledge that this evidence may not be relevant to an employee's subjective belief that the environment she faced was hostile, the EEOC contends that even evidence of harassment of which the employee was not aware is highly probative of whether the environment was objectively hostile and whether a reasonable employer should have known about the sexual harassment. Filing 133 at 15. In reply, BNSF addresses only part of the EEOC's argument, asserting that in the case on which the EEOC relies, the Eighth Circuit Court of Appeals held that the employer had constructive knowledge of (*i.e.*, should have known about) a hostile environment in part because plaintiffs were aware of nearly one hundred similar complaints made during the plaintiffs' employment. Filing 139 at 16.

---

[8] Incidents outside the limitations period that are not part of a continuing violation may be otherwise admissible to show background. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 113.

Apparently, BNSF's argument is that there are insufficient other complaints in this case to provide constructive notice.

      b.  The EEOC Can Rely on Harassment of which Merker Was Not Aware for Certain Purposes

As explained above, the fourth element of a sexually hostile environment claim is that the harassment affected a term, condition, or privilege of the employee's employment. *See Sellars*, 13 F.4th at 696. This fourth element "involves 'both objective and subjective components.'" *Warmington v. Bd. of Regents of Univ. of Minnesota*, 998 F.3d 789, 799 (8th Cir. 2021) (quoting *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016), in turn quoting *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 801 (8th Cir. 2009)). "To determine whether a complaint alleges an objectively hostile work environment, the court looks at the 'totality of the circumstances.'" *Id.* (quoting *Blomker*, 831 F.3d at 1057). To be subjectively hostile, "the victim must subjectively believe her working conditions have been altered." *Id.* (quoting *Blomker*, 831 F.3d at 1056). As to the fifth element of a hostile work environment claim concerning employer liability for coworker harassment—the kind of harassment that is at issue here—"the employer is liable only if the employer's own negligence caused the harassment or led to the continuation of the hostile work environment." *Sellars*, 13 F.4th at 696 (internal citations omitted). The question of the employer's negligence turns in part on "whether [the employer] knew or should have known of the harassment. . . ." *Id.* (quotation marks and citations omitted).

At the center of both parties' arguments on this issue of the relevance of incidents of harassment of which Merker was not aware is the decision of the Eighth Circuit Court of Appeals in *Sandoval*. In that decision, the court rejected the conclusion of the district court that "Eighth

Circuit precedent limit[s] a plaintiff's evidence in sexual harassment/hostile workplace cases to instances of harassment of which a plaintiff is aware." 578 F.3d at 802. Instead, the court held,

> A plaintiff . . . is not limited to offering such evidence only to prove the subjective component of a sexual harassment claim. Irrespective of whether a plaintiff was aware of the other incidents, the evidence is highly probative of [1] the type of workplace environment she was subjected to, and [2] whether a reasonable employer should have discovered the sexual harassment.

*Sandoval*, 578 F.3d at 802 (bracketed numbers inserted).

The Court will consider these two uses of such evidence in turn.

> i.    Such Evidence Is Relevant to the Objective Prong of the Hostile Environment Analysis

More specifically, as to the relevance of instances of harassment of which the complaining employee was unaware, the court in *Sandoval* explained,

> When judging the severity and pervasiveness of workplace sexual harassment, this court has long held harassment directed towards other female employees is relevant and must be considered. *See Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1014–15 (8th Cir. 1988) ("We also reject appellants' contention that the district court erroneously considered all of the women's claims together in determining that the harassment was sufficiently pervasive and severe...."). In *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 793–94 (8th Cir. 2004), the court discussed the distinction between evidence offered to prove the substance of a plaintiff's hostile work environment claim versus evidence offered to prove the severity and pervasiveness of harassment in the workplace. In *Williams*, the plaintiff (Williams) offered the testimony of several co-workers detailing a host of racially motivated harassment that occurred during his employment at Conagra's plant. *Id.* at 793. Conagra objected because Williams conceded he was unaware of the incidents, and according to Conagra, the evidence could not be used to prove Williams found the workplace subjectively hostile. *Id.* at 794. This court, recognizing the evidence was irrelevant to Williams's subjective perceptions of his workplace, nonetheless found the evidence highly relevant to prove, among other things, the type of workplace environment to which Williams was subjected. *Id.*

*Sandoval*, 578 F.3d at 802–03. Thus, BNSF is simply wrong when it asserts that harassment of which Merker was not aware is irrelevant, because such harassment is instead "highly probative" of whether the type of workplace to which Merker was subjected was objectively hostile. *Id.*

      ii.    Harassment of which Merker Was Not Aware Is Relevant to the Employer's Constructive Knowledge of a Hostile Environment

As to the employer's knowledge element, in *Sandoval*, the court affirmed the conclusion that the employer "exercised reasonable care to prevent sexually harassing behavior by establishing an anti-harassment policy and reporting procedures." 578 F.3d at 801. Nevertheless, the court noted that "plaintiffs allege[d] [the employer] was aware of nearly one hundred similar complaints made during the time plaintiffs were employed," which plaintiffs argued meant that the employer "had constructive notice of rampant sexual harassment by on-site supervisors." *Id.* at 801–02.

In *Sandoval*, the Eighth Circuit explained constructive notice as follows:

> In the context of sexual harassment claims, "[a]ctual notice is established by proof that management knew of the harassment." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003) (emphasis added). Whereas, constructive notice "is established when the harassment was so severe and pervasive that management reasonably should have known of it." *Id.* (emphasis added); see also *Martin v. Wal–Mart Stores, Inc.*, 183 F.3d 770, 772 (8th Cir. 1999) (noting an employer is deemed to have actual notice of a dangerous condition if an employee created or was aware of the hazard). "Constructive notice ... is established when the harassment was so severe and pervasive that management reasonably should have known of it." *Watson*, 324 F.3d at 1259. "[A]n employer may be charged with constructive knowledge of previous sexual harassment ... if the harassment was so broad in scope, and so permeated the workplace, that it must have come to the attention of someone authorized to do something about it." *Fall v. Ind. Univ. Bd. of Tr.*, 12 F.Supp.2d 870, 882 (N.D. Ind. 1998) (emphasis added) (citations omitted).

> > [T]here can be constructive notice in two situations: where an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer, or

> where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it.
>
> ...
>
> [T]hese standards strike the correct balance between protecting the rights of the employee and the employer by faulting the employer for turning a blind eye to overt signs of harassment but not requiring it to attain a level of omniscience, in the absence of actual notice....

*Kunin v. Sears Roebuck and Co*., 175 F.3d 289, 294 (3d Cir. 1999).

*Sandoval*, 578 F.3d at 802. The court in *Sandoval* explained that evidence of harassment of others of which the plaintiff was not aware in the constructive notice analysis is relevant as "evidence of widespread sexual harassment," *id.* at 803, *i.e.*, evidence that the harassment was so pervasive that it "must have come to the attention of someone authorized to do something about it." *Id.* at 802 (emphasis removed).

On this point, BNSF attempts to distinguish *Sandoval* on the ground that the Eighth Circuit held that the employer had constructive knowledge and knew or should have known of a hostile environment in part "because plaintiffs were aware of nearly one hundred similar complaints made during plaintiffs' employment." Filing 139 at 16. First, the Eighth Circuit explained that the plaintiffs in *Sandoval* argued that the employer's awareness, not the plaintiffs' awareness, of nearly one hundred similar complaints made to "on-site supervisors" during the time the plaintiffs were employed established the employer's constructive notice. *Sandoval*, 578 F.3d at 802. Second, nowhere in the court's analysis of either the employer's knowledge or the objective hostility of the environment did the Eighth Circuit comment on the number of complaints the employer had received. *See id.* Here, Merker has generated genuine issues of material fact that, like the plaintiffs in *Sandoval*, she and other employees repeatedly complained to "on-site supervisors" and even higher management about the harassment that they were experiencing. *See, e.g.,* Filing 140 at 11

43

(¶ 61.dd.) (Merker reported the incident with Mark Jones to Alex Adam, who was an on-site or first-line supervisor), 16 (¶ 68) (alleging that other female employees reported sexual harassment to BNSF at least seven times from 2017 to 2020), 24 (¶¶ 99–100) (Merker reported graffiti to William Boness, a senior road foreman trainmaster); 24 (¶ 102) (Merker reported inappropriate comments about women by Josh Lager to on-site supervisors); 25 (¶ 105) (Merker reported to an on-site supervisor that a male coworker bragged about his sexual exploits while at work); 26 (¶ 106) (Merker reported to the same on-site supervisor that another male coworker may inappropriate comments about women); 26 (¶ 108) (Merker reported inappropriate graffiti on trains to on-site supervisors or a higher management). This evidence may be offered to attempt to generate a genuine issue of material fact that "the harassment [wa]s so pervasive and open that a reasonable employer would have had to be aware of it." *Sandoval*, 578 F.3d at 802 (explaining that this was one situation showing constructive notice (quoting *Kunin*, 175 F.2d at 294)). However, as explained below, that attempt ultimately fails in this case.

Thus, as a matter of law, the EEOC can use conduct of which Merker was not aware in support of its hostile environment claim on her behalf. However, even though BNSF is not entitled to summary judgment on the ground that Merker was not aware of certain harassment, BNSF is nevertheless entitled to summary judgment on all of the EEOC's claims for other reasons stated below in § II.B.6.

### 5.    *Unwelcome Harassment*

In a direct attack on the EEOC's evidence on a specific element of its hostile environment claim, BNSF contends that an employee cannot consider herself subject to "unwelcome" harassment if she did not complain about it or otherwise make timely reports to a supervisor. Filing 125 at 15; *see also Sellars*, 13 F.4th at 696 (explaining that to succeed on a hostile environment

claim, the plaintiff must *inter alia* prove that she suffered unwelcome harassment). The EEOC disputes this contention. Filing 133 at 3–4.

        a.   The Parties' Arguments

BNSF argues that the EEOC cannot demonstrate that Merker was subject to any "unwelcome" harassment before she filed her administrative charge on January 18, 2018. Filing 125 at 15. BNSF argues that Merker asserted that she was subjected to daily harassment beginning in 2011, but that she did not report any acts of alleged sexual harassment to BNSF until after she filed her EEOC charge nearly six years later in January of 2018. Filing 125 at 16. BNSF argues that this is true even though Merker was aware of BNSF's policies against harassment and discrimination from the start of her employment. Filing 125 at 16. BNSF argues that this issue would resolve the entirety of the EEOC's claim because Merker admittedly did not report the overwhelming volume of the conduct on which the EEOC now relies, and the few incidents that she did report before and after January 2018 are "easily" rejected as too sporadic and insufficiently severe to survive summary judgment. Filing 125 at 17.

The EEOC counters that Merker did not welcome the "egregious" harassment from her male coworkers. Filing 133 at 3–4. The EEOC argues that the test of "unwelcomeness" is not whether Merker reported it but whether the conduct was "uninvited and offensive." Filing 133 at 4. The EEOC argues further that unwelcomeness is a difficult issue turning in large part on credibility determinations that present fact questions for the jury. Filing 133 at 4. Also, the EEOC argues that there is a genuine issue of material fact as to whether Merker reported sexual harassment and other conduct before January 18, 2018. Filing 133 at 4. The EEOC further challenges BNSF's premise by asserting that there is no requirement that the plaintiff report conduct to company officials to establish that the conduct was "unwelcome." Filing 133 at 4.

Rather, the EEOC contends, "unwelcomeness" can be indicated by the plaintiff's conduct. Filing 133 at 4. The EEOC points to incidents in which Merker told a male coworker not to speak to her unless it pertained to operating the train, pushed another male coworker away when he removed his shirt and approached her, and did not "laugh off" the harassment as evidence that the conduct was "unwelcome." Filing 133 at 5. Here, the EEOC asserts, Merker found the conduct to be "offensive," "obnoxious," "crude," and the conduct of "pigs." Filing 133 at 5 (quoting Filing 134 at 32 (¶ 63)).

In reply, BNSF argues that it has made a legal argument that Merker did not demonstrate unwelcome harassment by failing to report it, not that as a factual matter she was never offended by any conduct. Filing 139 at 10. BNSF reiterates that as a matter of law the failure to report harassment precludes the EEOC from showing the "unwelcomeness" element of its claim. Filing 139 at 10. BNSF also asserts that courts have considered "unwelcomeness" as an appropriate issue to determine at summary judgment. Filing 139 at 11.

    b. The "Unwelcomeness" Determination

As the Eighth Circuit has explained,

> "Harassing conduct is considered unwelcome if it was uninvited and offensive." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir. 1996). "The proper inquiry is whether the plaintiff indicated by [her] conduct that the alleged harassment was unwelcome." *Id.*, citing *Meritor [Sav. Bank, FSB v. Vinson]*, 477 U.S. [57,] 68, 106 S.Ct. 2399 [(1986)].

*Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 806 (8th Cir. 2019); *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 828 (8th Cir. 2017).

The Eighth Circuit considered the "unwelcomeness" requirement in greater detail in *Blake*. The court recognized a set of cases in which it found insufficient indication that the conduct was unwelcome:

In *Stuart [v. General Motors Corp.*, 217 F.3d 621 (8th Cir. 2000)]*, there was evidence the plaintiff was subjected to inappropriate sexual comments on a "regular" basis; pornographic photos and offensive signs in her locker and workspace; and "'saluting' by male co-workers" who would grab their genitals and make "'hoo-ha' noises" as she passed. *Id.* at 632. Though we held *a reasonable person* may consider this conduct to be unwelcome severe or pervasive harassment, we found no evidence *the plaintiff* considered it unwelcome during the time frame at issue. *See id.* Our decision rested almost entirely on the fact the plaintiff never made timely complaints about the alleged harassment, either formally or informally. *See id.* at 632 & nn.16-17. This reasoning has doomed plaintiffs in other cases, too. *See, e.g., Souther v. Posen Constr., Inc.*, 523 Fed.Appx. 352, 355 (6th Cir. 2013) (unpublished) (holding "a jury could not find [the] advances unwelcome" where the plaintiff "never complained" to the harasser "or anyone else," notwithstanding the plaintiff's "after-the-fact statement in her deposition" the conduct was unwelcome).

*Blake*, 870 F.3d at 828 (emphasis in the original). Similarly, "[o]ther cases have looked to the plaintiff's behavior, relationship with the alleged harasser, and history with the company to conclude the plaintiff could not prove the conduct was unwelcome." *Id.* (citing *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 962, 966 (8th Cir. 1999); *Souther*, 523 Fed.Appx. at 355; and *Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chi.*, 488 F.3d 739, 746-47 (7th Cir. 2007)).

The court in *Blake* also recognized a "second line of cases . . . in which the plaintiff adequately indicated the harassment was unwelcome":

Sometimes the plaintiff has satisfied this element by showing she explicitly rebuffed the bad actor's propositions or told the harasser she found the conduct offensive. *See, e.g., Williams v. Herron*, 687 F.3d 971, 975 (8th Cir. 2012) (deciding the plaintiff "adequately communicated" the conduct was unwelcome where she twice told the harasser it made her "uncomfortable"). Other times the plaintiff has reported the conduct to someone with the authority to address the problem. *See, e.g., Beach v. Yellow Freight Sys.*, 312 F.3d 391, 396 (8th Cir. 2002) (holding evidence was sufficient where the plaintiff "repeatedly complained" to management). We have also found it relevant when the bad actor somehow acknowledged his behavior was unwelcome. *See, e.g., Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1108 (8th Cir. 1998) (affirming jury verdict where the harasser admitted the plaintiff had "complained to him 'four or five' times about his conduct towards her"). Oftentimes the plaintiff has indicated the harassment was

unwelcome in more than one of these ways. *See, e.g., Jenkins*, 838 F.3d at 943, 945 (concluding the plaintiff satisfied her burden where she told the bad actor "multiple times" she was not interested in him, she notified a counselor and her academic advisor about the harassment, and the bad actor "was aware that [the plaintiff] found his advances unwelcome" given that "he 'apologized if his expressing interest in [the plaintiff] made her uncomfortable' "). There may well be other ways a plaintiff could adequately indicate unwelcomeness, these simply appear to be the most common.

*Blake*, 870 F.3d at 828–29.

In *Blake*, the court found the evidence put the plaintiff's claims in the first category of cases, that is, cases where there was no unwelcome harassment, where the plaintiff and the alleged harasser had known each other for forty years, and their relationship extended beyond the workplace. *Id.* at 829. Also, after complaining of an incident in 1999, the plaintiff continued to work for the employer for almost fifteen years without telling the alleged harasser to stop or complaining to anyone else at the workplace. *Id.* Furthermore, "[d]uring those fifteen years, [the plaintiff] and [the alleged harasser] joked around with one another; they occasionally exchanged "I love yous"; and [the plaintiff] sometimes touched [the alleged harasser] "between the shoulders." *Id.* The court explained, "While we are not under any illusion these acts are similar in kind to [the alleged harasser's] unprofessional and boorish behavior, it does nothing to convey the allegedly severe and pervasive conduct was unwelcome." *Id.* Finally, the court explained,

There is no evidence [the alleged harasser] was aware his conduct distressed [the plaintiff], either. Quite the opposite—[the alleged harasser] apparently saw his conduct as an attempt "to lighten [the] mood a bit," and [the plaintiff] recalls [the alleged harasser] would say she "need[ed] to be happy." *Cf. Jenkins*, 838 F.3d at 945; *Bales*, 143 F.3d at 1108. When [the plaintiff] finally did go to [the alleged harasser] to complain about how [the alleged harasser] treated her, she did not mention any of the conduct she now claims created a hostile work environment. Other than "a dirty look"—which it is unclear whether anyone even noticed—the first indication [the plaintiff] gave that she felt discriminated against was when she filed her administrative charge alleging as much. This is too little, too late. [The

48

plaintiff] cannot show she indicated in a timely manner the complained-of conduct was unwelcome, thus she cannot maintain a claim for hostile work environment.

*Blake*, 870 F.3d at 829–30.

In its reply, BNSF relies on *Stuart* and other cases as establishing a black-letter rule that a plaintiff's hostile work environment claim fails if the plaintiff did not make a complaint about any of the alleged incidents of sexual harassment. *See* Filing 139 at 10. However, in its original brief, BNSF asserted that "the facts" in this case are "strikingly similar" to those in *Stuart*. Filing 125 at 14. The Eighth Circuit in *Blake* certainly did not find that *Stuart* established any black-letter rule but instead found that the *Stuart* "decision rested almost entirely on the fact the plaintiff never made timely complaints about the alleged harassment, either formally or informally," that is, based on the facts presented. *Blake*, 870 F.3d at 828 (citing *Stuart*, 217 F.3d at 632 & nn.16-17). Therefore, the Court turns to the facts in the record in this case.

        c.   The EEOC Has Generated Genuine Issues of Material Fact on "Unwelcomeness"

The Court concludes that the EEOC has met its burden to generate genuine issues of material fact on the "unwelcomeness" element by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Jones*, 77 F.4th at 662–63 (quoting *Torgerson*, 643 F.3d at 1042). Those facts place this case closer to the second line of cases outlined in *Blake*, 870 F.3d at 828–29, and further from the facts presented in *Blake*, 870 F.3d at 829-30, itself, which led the *Blake* court to find that the conduct in that case was not unwelcome.

Specifically, asking "whether the plaintiff indicated by [her] conduct that the alleged harassment was unwelcome," *id*. at 828 (citing *Quick*, 90 F.3d at 1378); *accord Mahler*, 931 F.3d at 806, there are at least disputes of fact based on Merker's testimony about whether her conduct demonstrates unwelcomeness. Merker testified that she reported sexual or derogatory comments,

false rumors, sexual images, and sexual graffiti either to managers or at least to first-line supervisors before January 18, 2018. *See* Filing 140 at 24 (¶¶ 99–100) (BNSF does not dispute that Merker reported graffiti to William Boness prior to July 18, 2017), 24 (¶ 102) (no dispute that Merker reported comments by Josh Lager to a first-line supervisors although BNSF disputes the contents of the reports), 25 (¶ 105) (undisputed that in 2017 Merker reported a coworker bragging about his sexual exploits to a first-line supervisor), 26 (¶ 106) (undisputed that Merker reported another coworkers disparaging comments about women to a first-line supervisor prior to July 18, 2017), 26 (¶ 107) (Merker reported the July 2017 interaction with Jones to Alex Adam), 26 (¶ 108) (disputed that Merker reported graffiti on trains to two first-line supervisors on or about October 3, 2017), 27 (¶ 109) (disputed that Merker reported a fake camera above a train toilet around January 2018 to a first-line supervisor). BNSF has not cited any authority that only formal complaints to persons identified in an anti-harassment policy "count" to show unwelcomeness. To the contrary, complaints that demonstrate unwelcomeness may be either formal or informal. *Blake,* 870 F.3d at 828 (citing *Stuart,* 217 F.3d at 632 & nn.16–17). The EEOC has also pointed to evidence that Merker informed at least some of her alleged harassers that she found their conduct unwelcome, although the time frame of these incidents is not clear. *See id.* at 829 ("Sometimes the plaintiff has satisfied this element by showing she explicitly rebuffed the bad actor's propositions or told the harasser she found the conduct offensive."); *see also* Filing 140 at 15 (¶ 64) (undisputed that on at least one occasion, Merker instructed a coworker not to speak with her unless it pertained to operating trains), 15 (¶ 65) (undisputed that after a coworker removed his shirt and approached her, Merker pushed him away with her leg and told him to get away and to put his shirt on).

BNSF is not entitled to summary judgment on the EEOC's claims on the basis of BNSF's argument that the harassment was not "unwelcome" as a matter of law, even though BNSF is ultimately entitled to summary judgment on the EEOC's claims for other reasons.

### 6.    Actionable Harassment

Finally, the Court will consider BNSF's argument that the EEOC cannot demonstrate a triable case of coworker harassment, even taking the allegations of alleged harassment by coworkers as true. Filing 125 at 19. The Court finds that this is BNSF's most critical challenge to—and the one ultimately dispositive of—the EEOC's claim where, in the absence of a "continuing violation," the actionable harassment to which Merker was subjected must have occurred after March 23, 2017.

### a.   The Parties' Arguments

BNSF argues that the EEOC has alleged that Merker was subjected to no more than sporadic incidents of sexual or derogatory comments and slurs about women. Filing 125 at 17. BNSF also argues that Merker was allegedly subjected to an unknown number of undated instances when train bathrooms were allegedly intentionally soiled by unidentified male coworkers. Filing 125 at 21. Similarly, BNSF argues that Merker was allegedly subjected to no more than scant and episodic incidents of sexual graffiti or drawings that occurred after March 23, 2017, Filing 125 at 22–23. BNSF points out that there is no evidence of unwelcome physical contact or physically threatening sexually motivated behavior toward Merker. Filing 125 at 24.

In contrast, the EEOC argues that the harassing behavior toward Merker was sufficiently severe or pervasive that a reasonable person in Merker's position would have found his or her work environment hostile or abusive and that Merker herself found the environment hostile and abusive. Filing 133 at 6. The EEOC's response is based primarily on the EEOC's assertion that

there was a "continuing violation," Filing 133 at 7–8, but the Court rejected that contention above. The EEOC contends that "[t]he sheer volume of comments [to Merker] supports a finding that they were sufficiently frequent" to meet the pervasiveness requirement. Filing 133 at 9. The EEOC also relies on other kinds of allegedly harassing conduct and graffiti as establishing an actionable hostile environment. Filing 133 at 10.

In reply, BNSF asserts that even considering the entirety of alleged instances of harassment of all kinds within the limitations period, the EEOC lacks evidence to demonstrate conduct of legally sufficient severity or pervasiveness. Filing 139 at 13–14.

b.   Standards for Actionable Harassment

"To clear the high threshold of actionable harm, [a plaintiff] ha[s] to show that 'the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult.'" *Walker-Swinton v. Philander Smith Coll.*, 62 F.4th 435, 439–40 (8th Cir. 2023) (quoting *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002), in turn quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Consequently, the Eighth Circuit has explained,

> The Supreme Court has "cautioned courts to be alert for workplace behavior that does not rise to the level of actionable harassment." [*Blomker*, 831 F.3d] at 1056–57 (citation omitted). The "standards for a hostile environment are demanding, and conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment." *Id.* at 1057 (internal quotations omitted) (citations omitted). Courts must "*filter out complaints* attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (emphasis in original), quoting *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005); *Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d 841, 845–46 (8th Cir. 2006) (same). Even "vile or inappropriate" behavior may be insufficient to rise to the level of an actionable hostile work environment claim. *Blomker*, 831 F.3d at 1058.

*Warmington v. Bd. of Regents of Univ. of Minnesota*, 998 F.3d 789, 799 (8th Cir. 2021); *accord Walker-Swinton*, 62 F.4th at 440. Further, "[s]tray remarks in the workplace generally are not

severe or pervasive enough to change the conditions of employment." *Cooper Tire & Rubber Co. v. Nat'l Lab. Rels. Bd.*, 866 F.3d 885, 892 (8th Cir. 2017). Also, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The court must also consider whether the incidents were directed at the complaining party and whether those incidents involved actual touching or physically threatening conduct. *Warmington*, 998 F.3d at 800.

It is also important to remember that the employment context or the nature of the workplace matters. As the Supreme Court has explained,

> We have emphasized . . . that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." *Harris, supra*, at 23, 114 S.Ct., at 371. In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998). Thus, the Eighth Circuit has recognized that "actions that might not rise to the level of severe or pervasive [conduct] in an office setting take on a different character when the two people involved are stuck together for twenty-four hours a day with no other people—or means of escape—for miles around." *Jenkins v. Univ. of Minnesota*, 838 F.3d 938, 945 (8th Cir. 2016) (citing *Oncale*, 523 U.S. at 82). By the same token, conduct that might be severe or pervasive in an office setting might not rise to that level in

a rougher and more physical workplace in which the vast majority of the employees are of the same sex, such as the Alliance railyard. Cf. *Oncale*, 523 U.S. at 81–82; Jenkins, 838 F.3d at 845.

### c.   The EEOC Has Not Demonstrated an Actionable Hostile Environment

As the Court observed in its ruling on BNSF's Motion to Dismiss, the Court does not wish to minimize or condone the inappropriate and in many cases disgusting nature of the alleged conduct at BNSF's Alliance railyard. Filing 74 at 3. There is no question that Merker was subjected to abusive language, gender-related jokes, and occasional teasing. *See Warmington*, 998 F.3d at 799. Nor can there be a serious dispute that Merker described vile or inappropriate behavior. *Id.* Nevertheless, the conduct toward Merker in the record does not rise to the level of an actionable hostile work environment as a matter of law. *Id.* at 800. In making this determination, the Court has focused on conduct directed at Merker. *See id.* (noting that the environment did not rise to the level of actionable harassment because "[m]any of the incidents were not directed at [the plaintiff]" while those that were directed at her were insufficient).

The parties agree that on July 18, 2017, a male engineer named Mark Jones screamed angrily at Merker and used an obscenity when she asked why the train was going so slowly when she woke up after having "nodded off." Filing 134 at 8 (¶¶ 26–27); Filing 140 at 10–11 (¶ 61.bb.–gg.). Even assuming without deciding that the incident involving Mark Jones was because of Merker's sex, and that Merker perceived it as physically intimidating, that incident did not involve any physical touching. *Warmington*, 998 F.3d at 800. Also, considering the nature of the workplace—which can fairly be described as less formal than an office and one in which the vast majority of the employees are of the same sex (male)—"[c]ommon sense, and an appropriate sensitivity to social context" suggest that someone (male or female) who fell asleep while the train

54

was traveling would expect a tongue-lashing, even one framed in obscene language. *See Oncale,* 523 U.S. at 82. Even recognizing that only Jones and Merker were present and that they were stuck together for the remainder of the trip, proximity to an angry coworker of the opposite sex as the only other person in the workplace does not standing alone amount to a sexually hostile work environment. *But see Jenkins,* 838 F.3d at 945 (suggesting that being stuck alone with a harasser enhances the severity of the harassment). Just because coworkers of opposite sex are angry with each other does not mean that they are angry because of sex. It is completely ordinary for coworkers of the same or opposite sex occasionally to become angry with each other, and it simply is not always because of sex. Moreover, this single incident is not sufficiently severe standing alone to create a hostile work environment—and the EEOC has pointed to no similar incident either before or after the limitations period. *See Faragher,* 524 U.S. at 788 (explaining that "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment"). Also, in part because it is a single instance of this kind of alleged harassment, it does not push the totality of the circumstances into the realm of an actionable hostile environment.

Next, the Court recognizes that Merker said that in 2018 a male coworker commented in her presence that "women are cunts" and should not be working at BNSF, Filing 125 at 20, and on other unidentified dates a male coworker referred to women as "bitches" and called female employees of BNSF "ugly, stupid whores" who were looking for rich husbands. Filing 125 at 20. There is also evidence that a male coworker told Merker when he was exercising behind her that he was not staring at her ass, Filing 125 at 20, and on an unspecified date another male coworker walked up behind her and asked if she was ticklish, but she told him not to touch her, and he did

not. Filing 125 at 20. These comments are boorish, offensive, and wrong-headed, but they are at most sporadic. *Warmington*, 998 F.3d at 799 (explaining that sporadic incidents are not enough).

  Also, there is evidence an unidentified male coworker referred to a thimble as another coworker's condom during a training course at which Merker and others were present. Filing 125 at 20. While certainly inappropriate, this conduct is part of the "ordinary tribulations of the workplace" involving "gender-related jokes, and occasional teasing" that is not itself actionable. *Warmington*, 998 F.3d at 799. This conclusion is supported by the fact that the offenseive comment was from one male coworker to another male coworker, and was not directed to Merker or another female.

  Merker alleged an incident on or about August 12, 2018, in which an employee allegedly put pictures of a naked woman with a caption stating that it was another employee's wife on the windshields of vehicles at the Edgemont, South Dakota, depot. Filing 140 at 13 (¶ 61.ll.). However, the severity of this incident is considerably ameliorated because Merker was not shown the pictures by a male coworker but only received a text message about the pictures and the incident was at a different location. Filing 140 at 13 (¶ 61.ll.) (response). Likewise, there is evidence of an incident in July 2019 involving a framed photo of a man fishing that showed his penis dangling out of his shorts with the caption "Retirement." *See* Filing 140 at 13 (¶ 61.nn.); Filing 132-1 at 11 (sealed) (photo). Even if it is appropriate to treat these incidents as similar, two incidents involving photos of exposed genitalia in two years is too sporadic to be actionable. *Id.* The EEOC alleges perhaps one incident or some incidents within the limitations period in which Merker experienced comments on her appearance. *See* Filing 140 at 12 (¶ 61.kk.). The lack of any evidence of the frequency of such conduct also demonstrates that these incidents were sporadic.

The evidence of sexual graffiti provides a somewhat closer question on whether the environment as a whole was hostile. Merker reported seeing graffiti in October 2018, *see* Filing 140 at 13 (¶ 61.mm.), and she reported that same graffiti and turned in photos of it at about the same time, Filing 140 at 27 (¶ 112). She reported graffiti on or about October 3, 2017, *see* Filing 140 at 26 (¶ 108), and she reported and turned in photos of inappropriate graffiti on or about September 30, 2018. Filing 140 at 27 (¶ 111). Still, there is no evidence of how much graffiti Merker actually saw within the limitations period or when she took photos of it.

What gives the Court pause is that the Eighth Circuit has stated the following regarding graffiti:

> [W]e reject arguments that the plaintiffs had to articulate with absolute precision the number of times they saw the graffiti and that we should analyze each viewing as a separate instance of harassment. To that end, the "key difference" between graffiti and a racial slur should not be overlooked: "the slur is heard once" and "vanishes in an instant, while graffiti remains visible until the employer acts to remove it." Jerome R. Watson & Richard W. Warren, *"I Heard it through the Grapevine": Evidentiary Challenges in Racially Hostile Work Environment Litigation*, 19 Lab. Law. 381, 399, 404 (2004). This is particularly true for [graffiti that] the record establishes were present for a considerable amount of time, and [a plaintiff's] discussion of the bathroom graffiti, which frequently reappeared. A jury could reasonably conclude that the plaintiffs saw this graffiti on numerous occasions and, furthermore, that their mere awareness of its ongoing presence—regardless of the exact number of times they can remember seeing it—could contribute to a hostile work environment.

*Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 943–44 (8th Cir. 2010). In Watson, African-American members of a "shuttle" crew for a company that "provide[d] supply-chain management services whereby automobiles are shipped and received by railroad into a railyard operated by the company asserted a claim of a racially hostile work environment. *Id.* at 937. In Watson, the graffiti included "KKK" and "I hate n* * * *rs" carved into a workbench in a locker room that virtually all the employees visited on a daily basis; "n***er" written in a bathroom stall, *id.* at 938; and "a

car with 'hang a n* * * *r today' painted on the side" as well as "'kill the n* * * *rs' and 'f* *k n* * * *rs' painted with swastikas on railcars." *Id.* at 937–38. Even though the graffiti did not include threats against the plaintiffs by name, the Eighth Circuit held that the graffiti "could be reasonably viewed as threatening or intimidating." *Id.* at 944.

Although there are similarities between the workplace in *Watson* and the workplace in this case, there is a significant difference in the severity of the graffiti at issue in the two cases. In this case, the graffiti is prurient and disgusting but it does not state threats to the lives of women. As alleged by the EEOC, it involved "crude sexual images, including penises and vaginas," Filing 140 at 21 (¶ 91), and the words "#TITSFORTOOTS and #TOOTSFORTITS," Filing 140 at 13 (¶ 61.mm.). Here, "[c]ommon sense, and an appropriate sensitivity to social context"—that is, to the fact that the graffiti was on locomotives or in railyard facilities where most of the workforce are members of the same sex (male), as opposed to a professional office—distinguishes the graffiti at issue here from graffiti that a reasonable person in the plaintiff's position would find severely hostile or abusive. *See Oncale*, 523 U.S. at 82. Unlike the graffiti at issue in *Watson*, the graffiti at issue here is offensive but not severely hostile or abusive.

Even considering the "totality of the circumstances" relating to the post-March 23, 2017, harassment, as required by Eighth Circuit precedent, *see Warmington*, 998 F.3d at 799 (quoting *Blomker*, 831 F.3d at 1056), the EEOC has not met its burden on summary judgment to "come forward with 'specific facts showing that there is a genuine issue for trial'" on actionable harassment. *Jones*, 77 F.4th at 662–63 (quoting *Torgerson*, 643 F.3d at 1042). Instead, the Court concludes that under the applicable law the alleged harassment to which Merker was subjected during the limitations period, taken as a whole, was not sufficiently severe or pervasive to be actionable. *Greater St. Louis Constr. Laborers Welfare Fund*, 76 F.4th at 757 (explaining that

issues that only "[d]isputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material"). Consequently, BNSF is entitled to summary judgment on the EEOC's sexually hostile work environment allegedly inflicted on Merker. This conclusion makes it unnecessary for the Court to consider any remaining arguments for summary judgment by BNSF.

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that BNSF's Motion for Summary Judgment challenging all the EEOC's claims against BNSF, Filing 124, is granted.

IT IS FURTHER ORDERED that Judgment shall enter in favor of BNSF and against the EEOC.


Dated this 27th day of March, 2024.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge